Peter McGoorty, Appellant, v. Harold G. Benhart,
Appellee.

Gen. No. 9,515.

Heard in this court at the February term, 1940. Opinion filed May 15, 1940.

A. B. MANION, of Chicago, and HARRY G. WEAVER, of Wheaton, for appellant.

SEARS, O'BRIEN & STREIT, of Aurora, and RATHJE & WOODWARD, of Wheaton, for appellee; BARNABAS F. SEARS and JOHN S. WOODWARD, of counsel.

MR. PRESIDING JUSTICE WOLFE delivered the opinion of the court.

On the evening of June 25, 1938, Peter McGoorty, the plaintiff in this suit, together with a number of others, met at the home of Mrs. Bousser at 2448 North Dakin street in the city of Chicago with the intention of attending a sorority dance at the Itasca Country Club. Mr. McGoorty and five others left the Bousser home at about 9 P. M. in Mr. Clarence H. Paeglow's car. It was raining at the time, and Mr. Paeglow was driving. The party drove west on Irving Park boulevard until they had crossed an intersecting road known as Medinah corners. Mr. Paeglow drove the car a short distance west of this intersection and off of the pavement of Irving Park boulevard, intending to turn and go east, and then north on Medinah road. In making the turn, while his car was facing in a general southerly direction, the engine died, and the car came to a complete stop. Mr. Paeglow, in attempting

to start the engine, stepped on the starter, but got no response. Mr. Paeglow, Arnold Dahlman and Peter McGoorty got out to push the car in order to get the engine started. Mrs. Paeglow got behind the driver's wheel and guided the car. The three men pushed the car onto the pavement into the eastbound lane of traffic on Irving Park boulevard, and on the south side of the center line, proceeding eastward. The Paeglow car was equipped with headlights and taillights, which it is claimed were burning at the time. As the car was being pushed in an easterly direction on Irving Park boulevard, a car driven by Harold C. Benhart approached the same from the west and ran into and collided with the Paeglow car, slightly damaging the car and injuring Peter McGoorty.

Peter McGoorty started suit in the circuit court of Du Page county, to recover damages he claims he sustained because of the negligence and the wilful and wanton misconduct of the defendant, which caused this accident.

The complaint contained two counts. The first one charges that the defendant carelessly and negligently did all of the following acts, and as a direct and proximate result of which plaintiff, who was then and there in the exercise of due care and caution for his own safety, sustained damages. "(a) Drove his automobile along and upon Irving Park Boulevard without lights in violation of the Motor Vehicle Law of the State of Illinois. (b) Drove his automobile upon said public highway at a speed greater than was reasonable and proper, having regard to the traffic and the use of the way in violation of the Motor Vehicle Laws of the State of Illinois. (c) Upon approaching the plaintiff who was then and there walking upon said highway, failed to give a reasonable warning of his approach in violation of the Motor Vehicle Laws of the State of Illinois. (d) While overtaking and passing another vehicle proceeding in the same direction failed to pass

to the left thereof at a safe distance, thereby striking the plaintiff. (e) Drove his automobile upon said public highway without keeping a proper lookout for plaintiff or for other pedestrians or vehicles lawfully upon said highway."

The second count is based on the wilful, wanton and malicious conduct of the defendant, which caused the injuries to the plaintiff. The acts of negligence, as charged in the first count of the complaint, are the same in the second count, but charge the same were done wilfully and wantonly. Both counts set forth that the plaintiff was severely injured and asks damages in the amount of $50,000.

The defendant filed his answer in which he denies any negligence on his part was the proximate cause of the plaintiff's injuries. He denies that the plaintiff was in the exercise of ordinary care and caution for his own safety. He denies that he was guilty of any wilful and wanton misconduct that was the proximate cause of the plaintiff's injuries. He charges in his answer that the plaintiff was guilty of wilful and wanton misconduct which was the proximate cause of his injuries, and therefore he cannot recover in this suit.

The case was submitted to a jury. In addition to the general instructions read by the court to the jury, the plaintiff presented a special interrogatory for the jury to answer, which is as follows: "Was the defendant, Harold G. Benhart, guilty of wilful and wanton driving at and immediately before the time of the collision of his car with the plaintiff, Peter McGoorty?" The jury answered this interrogatory, "No." They found the issues in favor of the defendant. The plaintiff entered a motion for a judgment notwithstanding the verdict, which was overruled by the court, and then entered a motion for a new trial, which was also overruled by the court. Judgment was entered on the verdict in favor of the defendant, and the suit dismissed

at the costs of the plaintiff. It is from this judgment that the appeal is prosecuted.

It is first insisted that the verdict of the jury is contrary to the weight of the evidence, and therefore, the verdict should be set aside. It is undisputed that the plaintiff and two other men were pushing the Paeglow car on the pavement of a hard-surfaced road on a much traveled public highway; that the defendant, Harold G. Benhart, was driving his car in the same direction, and did not see the Paeglow car or the plaintiff, until he was within a short distance from them; that as the defendant approached the car, he attempted to stop; that he saw he couldn't stop his car, and then turned to the right towards the ditch in an effort to avoid striking the people pushing the car; that as he turned to the south, the plaintiff also saw the car approaching and started in the same direction; that the defendant attempted to turn his car back in order to avoid striking the plaintiff, and his car skidded and turned around; that the two cars came together, but neither car was seriously damaged, but the plaintiff was injured. The plaintiff was found lying at the rear of the defendant's car.

The speed at which the defendant was driving and whether the headlights of his car were burning, were disputed questions of fact. Some of the plaintiff's witnesses claimed the car was coming at an excessive rate of speed, and that the headlights were not burning. The defendant's evidence tended to show that his headlights were burning, and that he was not driving at an excessive rate of speed; that it was a very dark night with a misty rain falling; that he could see no lights on the Paeglow car and did not see the car until he was a short distance from it, and after he discovered the car, he did all that he could to avoid the accident.

In a jury trial, controverted questions of fact are for the jury to decide, and after they have decided such facts, a court of review will not set aside their verdict,

unless they can say that the verdict of the jury is against the manifest weight of the evidence. From a review of the evidence in this case, it is our conclusion that the verdict of the jury is not against the weight of the evidence, but is sustained by it.

The appellant contends that the trial court erred in submitting to the jury the question, as to whether or not the plaintiff was guilty of wilful and wanton misconduct. The case was tried on the theory that the defendant was guilty of wilful and wanton misconduct, as charged in the second count of plaintiff's petition, which was the cause of the plaintiff's injuries. If the plaintiff was guilty of wilful and wanton misconduct that proximately caused his injuries, this would be a bar to his recovery. It is undisputed that the plaintiff and two other men were pushing the Paeglow car. Three men pushing the car, in all probability, prevented the defendant from seeing the taillights of the Paeglow car, if burning. It was for the jury to consider as to whether the plaintiff was guilty of wilful and wanton misconduct in helping push a car down a main-traveled paved highway on a misty, dark night. The plaintiff tendered instructions, which the court gave to the jury upon the theory that the defendant was guilty of wilful and wanton misconduct. He also tendered a special interrogatory as to whether the defendant was guilty of such conduct, so under the facts and circumstances, as presented in this record, it was not error to submit the question of the plaintiff's wilful and wanton misconduct to the jury. The court properly gave defendant's Instructions Nos. 9 and 17.

Objection is made to the defendant's Instructions Nos. 18, 19 and 20. Under the facts and circumstances appearing in the record of this case, we think it was not error to give these three instructions.

It is also insisted by the appellant that the court erred in refusing to give plaintiff's tendered instructions set out on pages 124, 125 and 126 of the abstract,

which are copied in his printed brief and argument. The appellant does not point out in what particular, if any, the court erred by refusing to give these instructions. Under the rules of this court, an error assigned, but not argued, is considered waived, so we are not considering the merits of these refused instructions.

The defendant called as a witness, Frederick A. Hurst who testified that his business was taking moving pictures; that he took moving pictures commercially for use in court and other places; that he had been engaged in the business for 15 years; that he took moving pictures of the plaintiff, Peter McGoorty, on Tuesday, June 20; Wednesday, June 21; on Friday, June 23; and on Sunday, June 25, all in 1939; that the pictures were taken with a Bell and Howell camera; that the camera was in first-class working order. The film used in the camera was good quality; that as he took the pictures he could see the objects all the time the camera was in motion; that he used three rolls of films in taking the pictures; that he delivered the three rolls of films to the Eastman Kodak Company for the purpose of having them developed; that the films were developed and returned to him; that he projected the films upon a screen and they correctly portray the conditions and objects, as he saw them through the use of his naked eye at the time he was photographing them.

Mr. Hurst testified and described in detail how he took the pictures; that he would run his camera for a few seconds and then change his position and follow the plaintiff to some other place; that in taking the pictures, it took about four minutes to take 100 feet of pictures; that there was 300 feet of film used in all of the pictures; that there has been no cutting, erasing, or tampering with the films, but they are in the same condition as they were when they were taken out of the camera. Mr. Hurst further testified that he was employed by Mr. Stein of the Stein Detective Agency, and had been so employed for quite a number of years;

that he did not know the young lady who appears in the pictures with Peter McGoorty, but he does know that she was not connected with Mr. Stein's Detective Agency; that all he knew about the parties is that Mr. Stein pointed out Peter McGoorty to him and gave him instructions about taking the pictures.

Mr. Michael D. Francis testified that he was in charge of the Service Department of the Eastman Kodak Company; that he had seen the films referred to by the witness, Hurst, and that he personally put the films on a developing machine to have them developed; that they were developed in the usual and customary manner used in the development of moving camera films; that he returned the developed films to Mr. Hurst and that they were, at the time of the trial, in the same condition as they were when he delivered them to Mr. Hurst.

After this preliminary proof the films, which were designated as defendant's Exhibits 7, 8, and 9, were offered in evidence. To this offer, the plaintiff made the following objection. "The plaintiff objects to the introduction of the films on the ground that they do not impeach, or tend to impeach any testimony offered by the plaintiff, or on behalf of the plaintiff, that the pictures do not show a continuity of action, that they are misleading as showing only a few seconds exposure and taken at different times to make one connected reel; they are inadmissible because there was present in court a man who could testify as to what he saw. The pictures would be only secondary evidence and prejudicial." The objections to the offer of the exhibits were overruled and the same admitted in evidence. After they were admitted in evidence, leave was given the defendant to show the moving pictures on a screen to the jury.

A projector and standard daylight screen were brought into the court room and the same exhibited to the jury. The evidence shows that the screen was about 3 feet from the floor and approximately 15 feet

from the projector; that the machine was operated at a normal speed.

The films have been certified to this court, and on the insistence and request of the appellant, a screen and standard projector were brought into the court room and the pictures shown to the judges of this court. The first picture shows the plaintiff at a golf course, what is commonly called a driving range. He and his lady friend are using a bucket of balls and the plaintiff especially, is driving the balls out into the field. The plaintiff stoops over to take a ball out of the bucket or basket, places it on a tee and strikes the ball with splendid form and carry through. The plaintiff is next seen tossing a basketball. Next he is seen throwing baseballs at a doll rack, or some similar device. Next he is rowing a boat. He is next seen at the lake front preparatory to going swimming. He had his swimming trunks on under his clothes, and the camera discloses that he undressed at the beach, but was not wearing his leather jacket. He and his blonde lady friend go in swimming, and he is shown teaching her how to swim, and lifting her almost out of the water, and as the picture ends it is as though he were rescuing her from drowning, with his left arm under her chin and supporting her and swimming around with his right arm.

It is first insisted that the introduction of these films was error on the part of the trial court because they do not impeach, or tend to impeach any testimony offered by the plaintiff, or on behalf of the plaintiff. An examination of the record discloses that the plaintiff testified that he was unable to take any kind of exercise, unless he wore his brace. Counsel for appellant argues that Peter McGoorty misunderstood this question. It seems to us that when the plaintiff answered this question that he could not be mislead in any manner as to what the meaning of the question was, that is, that he didn't take any kind of exercise without wearing the brace. The plaintiff, in rebuttal, testified that

on the day that he was playing golf with the "blonde woman," that he was not wearing the brace and the pictures show that he was not wearing it a few days later when he went swimming. Doctor Horace E. Turner who had treated the plaintiff for his injuries testified in part as follows: "While he, (the plaintiff) was in the hospital I saw him daily and sometimes twice or three times a day. I saw him last about a week ago. He was in my office at that time. His walking was rather stiff, what I would call a stilted manner. I had him stoop down and bend down. He was able to stoop over, but he couldn't touch the floor. He could get about to his knees." The plaintiff claimed that he was seriously and permanently injured, and is suing for the sum of $50,000, damages. These pictures successfully impeached the doctor's testimony that the defendant could not stoop lower than to his knees and could not touch the floor. The picture of him playing golf shows him picking up the ball, and placing it on the tee, which are both on the ground. The one showing him using the basketball as a football shows him stooping over and putting the ball upon the ground and then passing it between his legs in the same manner as a football is passed in a regular game. Certainly this evidence tended to show that the plaintiff was not as badly injured as he claimed he was.

It is next insisted that the pictures do not show a continuity of action, therefore they are misleading, as showing only a few seconds exposure, and taken at different times to make it one connected reel. We see no merit in this contention, because the operator of the moving camera explained in detail how the pictures were taken; that he had to move his camera around from place to place, and only making a few seconds exposure, at each place; that his purpose was to follow the plaintiff and get as many action pictures as it was possible to do so. It is a well-known fact that any moving picture that we go to see, that perhaps is shown

in one hour, it may take them six months, or perhaps a year to make the picture. We do not see how the jury could be mislead because of this objection.

The next objection is that the pictures are inadmissible because there was present in court a man who could testify as to what he saw. The man who took the pictures could have testified to what he saw the plaintiff doing, but he could not describe in detail just how the plaintiff was doing it, as was done by the use of the camera.

It is next insisted that ''the pictures would be only secondary evidence and were prejudicial.'' It has long been the law that photographs correctly portraying the scene of an accident are admissible in evidence, although many people may be present and see the accident and describe the surroundings where the accident occurred. Photographs taken after the accident either of the position of the cars, if it is an automobile accident, the level of the street or road, the buildings, if any, at the corners of the intersection, a railroad crossing, if the accident happened at a railroad crossing, in fact all conceivable places where an accident may happen, have been admitted in evidence and never questioned, provided the proper foundation is laid for the admission of the photographs.

The appellant has cited several cases where moving pictures have been rejected as evidence, but an examination of nearly all of these cases discloses that at the time the pictures were offered in evidence, there was some preliminary proof lacking, as to how the pictures were taken. Neither our Supreme or Appellate Court have had occasion to pass upon this question, but courts from other States have had the same thing presented to them and held that they are admissible. In the case of *Boyarsky v. G. A. Zimmerman Corp.*, 240 App. Div. 361, 270 N. Y. Supp. 134, the plaintiff was injured and claimed he was totally disabled and unable to work. The court, in its opinion, review sev-

eral of the cases cited by the appellant, and state wherein the offer to admit the moving pictures in evidence was proper. In passing upon the merits of this case, they use this language: "Several cases have been cited where evidence of moving pictures has been properly rejected. In these cases the purpose was shown to be merely sensational. Where there is no need of such pictures, as in several of the cases adverted to, the trial court is within its right in rejecting such testimony.

"In the present case the defendant, appellant, properly points out that the pictures taken of the plaintiff, who contends that he received very severe injuries, will show that he went to live in another city and there evidently conducted himself as a perfectly well man instead of the invalid which he claimed to be. It is argued that these moving pictures should be shown to the jury so that it may intelligently pass upon the question whether the condition claimed to exist is real or feigned.

"The well-known progress being made in the moving picture world has resulted in great accuracy in depicting the true conditions sought to be shown. The mechanical means of perfecting such pictures has become so general that it may be necessary in the near future to frequently permit their introduction in evidence. In many cases the pictures may not only have a bearing upon the facts but may be absolutely decisive of the issues involved in the action. Their remarkable accuracy is now generally acknowledged through their constant use as a means of recording and publishing news items of interest to the public, and for that purpose they are featured daily in many of the moving pictures theaters of the world."

The court then reviews the cases of *Massachusetts Bonding & Insurance Co. v. Worthy* (Tex. Civ. App.), 9 S. W. (2d) 388; *State to Use of Chima v. United Rys. & Elec. Co.,* 162 Md. 404, 159 Atl. 916; *Field v. Gowdy,*

199 Mass. 568, 85 N. E. 884; *Everson v. Casualty Co.
of America*, 208 Mass. 214, 94 N. E. 459, and then
quotes from Wigmore on Evidence (2d Ed.), sec. 798:
"No general rule can be laid down as to the kinds of
occurrences, artificially reconstructed, in which the
moving picture would have a special risk of mislead-
ing.

"(b) But where the moving picture is taken with-
out artificial reconstruction, i. e., at the time and place
of the original event (a possibility not infrequent), it
lacks the above element of weakness and is entitled to
be admitted on the same principles as still photo-
graphs. The only circumstance then to be considered
is that in a few matters, such as speed and direction
of human movement, or relative size in the focus, the .
multiple nature of the films requires special allowances
of error to be made; but these allowances are no dif-
ferent in kind from the elements of error inherent un-
der certain conditions in still photographs." The
court then concludes, "based on the rule there stated,
it seems to us that the moving picture which the de-
fendant sought to introduce in the present case was
admissible providing the requisite precautions were
followed by the justice presiding at the trial."

In the case of *Heiman v. Market St. Ry. Co.*, 21 Cal.
App. (2d) 311, 69 P. (2d) 178, the Supreme Court of
California was considering the admissibility of mov-
ing pictures in evidence in a personal injury suit. The
court in passing upon the admissibility of the evidence,
have this to say: "After Mrs. Heiman became con-
valescent, she went to Palo Alto for the purpose of rest
and to further recuperate. During the period she was
at Palo Alto she claimed to have been so debilitated,
sick, sore, and nervous, as to be a confirmed invalid.
As a part of its case, the defendant introduced a set
of moving pictures. They purported to show Mrs.
Heiman's movements in Palo Alto; to show her driv-
ing an automobile in and out of heavy traffic; and to

show her shopping, walking, stooping, and bending without assistance from any one. They also showed her carrying grocery bundles. The testimony showed that the pictures were taken in August, about two and a half months after the injury occurred. The plaintiffs contend no foundation was laid, but they do not show in what respect it was not laid. The plaintiffs go further and contend that in no instance should moving pictures be received in evidence. This contention is based on the fact that numerous 'pranks and tricks' may be developed on the screen. The same contention can be made regarding many classes of evidence. The record before us does not disclose that the reels were examined and it was disclosed they had not been altered in any respect. But when, as here, testimony is introduced to the effect that the picture is a true representation of the scene as witnessed by the photographer, the objections mentioned are without foundation. That photographs may be admitted in evidence will hardly be questioned (10 Cal. Jur. 896) ; that moving pictures are but a series of single pictures is known to every one. If single pictures may properly be received in evidence, it is difficult to see any reason why moving pictures may not be, and at the present time the general rule is that they may be. *Boyarsky v. G. A. Zimmerman Corp.*, 240 App. Div. 361, 270 N. Y. S. 134, 137; Wigmore's 1934 Supplement to his work on Evidence, p. 339. It has been held that under certain circumstances moving pictures should not be received in evidence. *State of Maryland for Use of Chima v. United Rys. & Elec. Co.*, 162 Md. 404, 159 A. 916, 83 A. L. R. 1307. In that case and cases there cited, it will be noted that under the facts a still pictures would not have been admitted in evidence. However, in 162 Md. at page 418, 159 A. at page 921, 83 A. L. R. at page 1315, the Supreme Court of Maryland said: 'When moving pictures might and might not be used advantageously and properly in placing the facts before

juries is a question the answer to which must vary with one case and another, and we think the decision in each case must be left largely to the judgment and discretion of the presiding judge, without any restricting general formula laid down to control him.' In the instant case we think it is clear that the trial court did not abuse its discretion in allowing the moving pictures to be exhibited to the jury.''

The appellant claims that the court erred in refusing to permit him to show the facts surrounding the taking of the moving pictures. In the trial court, the plaintiff made an avowal that he could show that the lady that appears in the pictures with the plaintiff was an employee of either the defendant, or someone interested in the result of the suit, and it was at this girl's solicitation that the plaintiff engaged in the activities that are shown by the pictures. We do not think it is material what part this girl took in persuading the plaintiff to do what the pictures disclose he did do. The pictures speak for themselves and show that the defendant could do things that he claimed at the trial he could not do. There is no merit in this contention.

That photographs may be admitted in evidence in the trial of cases, especially personal injury suits, will hardly be questioned. Moving pictures are but a series of single pictures, known to everyone. Each single picture may be properly received in evidence, and it is difficult to see any reason why moving pictures may not be admitted in evidence also. It is our conclusion that the proper foundation for the admission of the moving pictures in evidence was proven, and the court properly admitted the same in evidence.

We find no reversible error in the case, and the judgment of the trial court is hereby affirmed.

*Affirmed.*