**Morgan J. Mathias, Plaintiff-Appellee, v. The Baltimore and Ohio Railroad Company, Defendant-Appellant.**

**Gen. No. 51,889.**

First District, Fourth Division.

March 20, 1968.

Rehearing denied April 19, 1968.

John H. Gobel, Nicholas Liontakis, and R. L. Galassini, of Chicago, for appellant.

Robert E. Harrington and John J. Naughton, of Chicago (Henslee, Monek & Henslee, of counsel), for appellee.

MR. JUSTICE DRUCKER delivered the opinion of the court.

Defendant appeals from a jury verdict and judgment for $30,000 for personal injuries.

Plaintiff's complaint filed November 21, 1960, under the Federal Employers' Liability Act (45 USCA § 51) alleged that on November 21, 1957, while working for defendant at Willard, Ohio, plaintiff was injured by a ladder striking him on the head when it was knocked over by another employee pushing a wagon. Defendant's answer denied the allegation of the complaint and affirmatively defended on the ground that on March 10, 1958, in consideration of the sum of $1,500 plaintiff released defendant of all claims and demands. Plaintiff's reply to defendant's answer set out fraud and misrepresentation in the procurement of the release and a mutual mistake of fact as to the nature and extent of the injuries. During the trial defendant admitted liability for the accident and the trial proceeded on the issue of the validity of the release.

On appeal defendant contends:

1. That the court erred in not directing a verdict in favor of defendant;

2. That it was error not to allow the showing of defendant's surveillance movies;

3. That the court erred in submitting a special interrogatory on mutual mistake and refusing to submit a special interrogatory on fraud; and

4. That the court committed other trial errors.

*Testimony of Plaintiff*

On November 21, 1957, while working for defendant at Willard, Ohio, he was struck on the forehead by the top of a falling ladder. He fell to the ground bleeding profusely from a one and one-half inch cut; he received first aid but was sent home by Dr. Drury and told to take the rest of the day off and apply ice packs. He did not return to work until November 27 but worked from then until January 10, 1958; he had bad headaches and saw Dr. Drury three or four times during that period and received pain pills. His first fainting spell occurred on December 7, 1957, and the spells lasted until March; he was ordered to go to Willard Municipal Hospital for X rays in December of 1957, where he received pain pills and diathermy and was advised to have heat treatments. On January 10, 1958, Dr. Drury told him to stay off work for a week. He saw Dr. Book at Willard Hospital and was directed to go to Chicago St. Luke's Hospital for examination by Dr. Harry Mock and two other specialists where he received spinal, brain wave and X-ray tests and had water injected into his ear. He was kept in traction from February 5 until February 21, 1958. He was told by Dr. Mock that there was nothing the matter with him and he believed it. On March 10, 1958, he had a conversation with Mr. Leaman (District Claim Agent for defendant) at his office; Mr. Leaman told him that he would have to sign a release to obtain his back wages and they would "come up with fifteen hundred dollars." Mr. Leaman told him that he couldn't come back for more money if he signed that release ". . . but they would play fair with me if [sic] any future doctor bills or if I had to go back to the hospital or anything like that they'd take care of it, and at that time I thought he meant wages also if I was off any more." He signed the release and received $1,500 less the $329 which had been paid to him prior to that time as sick benefits.

260

He returned to work the next day, March 11, 1958. The defendant paid $325 in doctor bills after the settlement; however it stopped paying in April 1959. When he continued to suffer from dizziness and pain in his neck, he called in sick on May 25, 1960, and that was his last day of work on the railroad. He lost no time from work between March 1958 and May 1960. He saw Dr. Drury 156 times after the B. & O. stopped paying, receiving diathermy treatments, pain pills and circulation pills for dizziness. He still suffers from dizziness, pain and severe headaches for which he took the pain and circulation pills prescribed by Dr. Drury and applied heat. The pills helped but caused extreme pain in his left eye. The defendant refused all medical expenses after August of 1959.

Prior to the accident he had no complaints of dizziness or pain in the back of his neck and no doctor had told him he had arthritis. (Defendant's Exhibit 12 showed that in a complaint filed for a disability allowance with the Veterans Bureau in 1930 he listed symptoms of "dizziness, frequent urination, pains in back and through chest, severe headaches, nervousness.") Dr. Drury was the only doctor actively treating him; the others were only examining him. He had a little dizziness between the time of the accident and the time he signed the release but he didn't know at the time of the signing that he would suffer from fainting spells and pain in the back of the neck. The dizziness grew worse after the release, and he found it difficult to work around moving equipment now.

*Testimony of Milton Leaman, witness for defendant*

He was the claim agent who negotiated the release from plaintiff for $1,500. The amount of plaintiff's lost wages was $776.96. In addition to the $1,500 settlement, $886 was paid by defendant for plaintiff's medical expenses. He told plaintiff that he could not come back at any later date and receive anything; that defendant would

take care of future medical bills so long as the medical department went along with it; that Leaman knew that plaintiff was receiving "future medical," and that he was going to Dr. Drury, and that this was the reason he (Leaman) felt the company would go along with this as long as there was a relation between the accident and the condition.

OPINION

Defendant first contends that a verdict should have been directed in its favor at the close of all the evidence. Defendant admits its responsibility for injuries caused by the accident but argues that there was insufficient evidence to support the finding of mutual mistake or fraud necessary to set aside the release. In Dice v. Akron, C. & Y. R. Co., 342 US 359, 361, the court held that the "validity of releases under the Federal Employers' Liability Act raises a federal question to be determined by federal rather than state law."

In Graham v. Atchison, T. & S. F. Ry. Co., 176 F2d 819, the testimony of the plaintiff was similar to that of the instant plaintiff. In Graham the court stated at page 825:

> The plaintiff testified definitely that he did not, at the time the release was signed, believe that he had this injury to the spine; that he believed that his injuries were not serious and that, as urged by Dr. Morrison, he could and should go back to work as quickly as possible. The jury might well have believed that he would not have entered into this release had he been informed of the true nature of the injury which he had suffered and of its permanency. There is evidence in the record that the injury is traceable to the accident and that it is of a permanent nature, requiring surgery to correct. The plaintiff had the right to have submitted to the jury, for their determination, these facts.

262

The following factors negative defendant's contention that a verdict should have been directed in its favor:

(1) Plaintiff's testimony that he was told shortly before he signed the release by Dr. Harry Mock (to whom he was sent by defendant and who was paid by defendant) that there was nothing the matter with him.

(2) Plaintiff's doctor's testimony that there was causal connection between the trauma caused by the injury and plaintiff's condition.

(3) The affirmative testimony of some of the doctors called by defendant as to the existence of calcification of the fifth, sixth and seventh vertebrae, the relationship between this calcification and the plaintiff's dizziness and headaches and the effect of the accident on this condition.

(4) Plaintiff's testimony that he was told by defendant's claim agent that defendant would pay for his future medical expenses.

The court's refusal to direct the verdict was proper. ■ ■ Defendant next contends that the court committed prejudicial error in refusing to admit surveillance movies into evidence. The movies depicted plaintiff doing maintenance work around his home, carrying a large post and riding atop his lawn mower. The validity of serveillance movies as evidence at a trial is well settled. McGoorty v. Benhart, 305 Ill App 458, 27 NE2d 289. In that case the court relied on Boyarsky v. G. A. Zimmerman Corp., 240 App Div 361, 270 NYS 134, which held that it was reversible error to refuse to allow the projection of motion pictures showing the physical capabilities of plaintiff. There plaintiff also claimed to have been hit on the head with resulting total disability and inability to work. (The object hitting him was a bolt two and one-half inches long and one and one-quarter inches across.) In the instant case plaintiff testified that he takes care

of the maintenance of his house; that he mows the lawn which was four acres until he sold some of it. Previously he stated that he found it difficult to work around moving equipment. Plaintiff's doctor testified that in his opinion plaintiff could not have continued working around moving machinery because of "episodes of dizziness or blackout and of recurrent difficulty in pain with the neck and head area." Dr. Drury, plaintiff's treating physician for over eight years, testified that in his opinion from the time he ordered plaintiff back to work in 1958 until March 1966 there were no objective findings which would prevent plaintiff from returning to work. Other doctors, testifying for defendant, found that plaintiff's prior arthritic condition was affected slightly, if at all, by the trauma of the accident. Dr. Miller, after examining plaintiff in March 1966 had an opinion that a man in plaintiff's condition "could return to his usual occupation consistent with his age." In view of the conflicting testimony on plaintiff's capacity to work, we believe the court erred in not allowing the motion pictures to be shown.

The next issue presented by defendant relates to the special interrogatories. Defendant requested the court to give two: one, asking whether there was any mutual mistake as to the nature and extent of plaintiff's injury and the other, asking whether Mr. Leaman (defendant's agent) was guilty of any fraud when he procured plaintiff's release. The court gave the first one (which was answered in the affirmative by the jury) but refused to give the second. In Todd v. Borowski, 25 Ill App2d 367, 375, 166 NE2d 296, the court said:

> Special interrogatories are used for the purpose of testing the general verdict against the jury's conclusions as to the *ultimate controlling* facts—the statute expressly provides that the answer to the special interrogatory controls the general verdict when inconsistent, and it may not be nullified by disregarding its mandate. (Citing cases. Emphasis supplied.)

In determining whether the special interrogatory as to mutual mistake was proper, the trial court had to consider at the time it was presented to him, whether the answer to that interrogatory if inconsistent with a possible verdict would control that verdict; e. g. if the general verdict was in favor of plaintiff, a negative response to the interrogatory about mutual mistake would not control the general verdict because the jury might have believed defendant guilty of fraud.* We therefore believe that the giving of the one special interrogatory did not relate to an ultimate controlling fact upon which the rights of the parties directly depended and the court erred in giving it.

Defendant urges twenty-six other trial errors. Since we have decided to reverse the judgment and remand the case for a new trial we deem it unnecessary to answer these points. We hope that the experience of the trial and the appeal will serve to acquaint the parties with these problems and lead to a more expeditious presentation of the evidence and instructions in the new trial.

The judgment of the Circuit Court is reversed and the cause remanded for a new trial.

Reversed and remanded.

McCORMICK, P. J. and ENGLISH, J., concur.

---

* In addition to the claimed fraud on the part of Mr. Leaman in obtaining the release, plaintiff also urged that if there was no mutual mistake when Dr. Harry Mock told plaintiff that there was nothing wrong with him, then there was fraud. In Matthews v. Atchison T. & S. F. Ry. Co., 54 Cal App2d 549, 129 P2d 435, 441, the court said:

The statement made to plaintiff by defendant's physicians, that he had recovered, was one of fact. (Citing cases.) It was believed by plaintiff, and if it was also believed by the physician, the case is one of mutual mistake. If the statement was not believed by the physician, we have a case of fraud.