JAMES CARNEY, Plaintiff-Appellant, v. SHERMAN SMITH *et al.*, Defendants-Appellees.

First District (2nd Division) No. 1—91—1494

Opinion filed December 29, 1992.

Tyrrell, Etchingham & Associates, of Chicago (Thomas J. Tyrrell, James P. Etchingham, and Joseph E. Tighe, of counsel), for appellant.

McKenna, Storer, Rowe, White & Farrug, of Chicago (James P. DeNardo and Christine L. Olson, of counsel), for appellees.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiff James Carney (Carney) was injured when his car was struck from behind by an 18-wheel tractor-trailer. Carney sued defendants Sherman Smith (Smith), the driver of the truck, and the Maxwell Company, Smith's employer, to recover damages for his injuries. A jury returned a verdict in favor of Carney, finding that he suffered $153,000 in damages, but reduced the award to $76,500 because it assessed Carney's comparative fault at 50%. On appeal, Carney seeks a new trial, alleging that (1) the circuit court improperly allowed covert surveillance videotapes to be played before the jury, and (2) the jury's verdict was against the manifest weight of the evidence.

At trial, Smith testified that he was a leased truck operator for the Maxwell Company, and that he had been driving trucks for 33 years. On June 26, 1987, he was travelling south in the right lane of Interstate 294 (I-294), in an 18-wheel tractor-trailer. He had unloaded his truck in Milwaukee and was on his way to Cincinnati to pick up a new shipment. His truck weighed 30,000 pounds when it was empty, and could haul up to 78,000 pounds of cargo. Approximately one-quarter of a mile north of Willow Road, he noticed a black limousine and a red Ford Escort pass him on the left and merge into the right lane. Since traffic was heavy, he was travelling only 25 to 30 miles per hour. As he approached the Willow Road exit, he slowed the truck to 15 to 20 miles per hour.

Approximately 100 feet before the exit, Smith noticed Carney's 1977 Oldsmobile Cutlass cross from the left lane and attempt to merge into the right lane behind the limousine and the Escort. Traffic stopped in front of the limousine, causing all three cars to stop. The rear of Carney's car was angled to the left jutting out of the lane. Smith slowed to 5 to 10 miles per hour when he saw Carney's brake lights.

Five to ten seconds after Carney entered the right lane, Smith's left front bumper collided with the right rear of Carney's car. Smith was travelling about five miles per hour at the time of impact. After the collision, Smith apologized to Carney and told him that the truck was empty. At trial, Smith explained that an empty truck slides easier than a full one, and that the new asphalt surface on the roadway caused it to feel "greasy." He also explained that he paid a fine for failing to reduce speed to avoid a collision, but only because he could not afford to miss a day of work and return to Chicago in order to challenge the ticket.

Peter Balgemann testified that he was the driver of the Ford Escort. On June 26, 1987, he was driving south on I-294 in the right lane, though he could not recall how long he had been driving in that lane. When traffic suddenly stopped, he hit the rear of a limousine directly in front of him. After he and the other driver determined that neither car was damaged, the limousine left the scene, but before he could move his car, his car was "bumped" from behind by Carney's car. Neither car suffered any damage.

Carney testified that on Friday, June 26, 1987, at approximately 2 p.m., he was travelling southbound in the right lane of I-294 on his way to work at Allstate corporate headquarters in Northbrook. Because he intended to exit at Willow Road, he remained in the right lane for the three miles after the Deerfield Toll Plaza. He had entered the right lane at the toll plaza because he did not have exact change for the toll and therefore had to use the manual toll booths on the right side of the plaza.

Approximately two miles before the Willow Road exit, Carney noticed a Ford Escort in front of him. Just north of the exit, he noticed the Escort's brake lights and assumed that the car was slowing down due to the heavy traffic. The Escort came to a stop, however, and in an attempt to avoid a collision, Carney "slammed" on his brakes. The rear of his car swerved to the left and the front came into contact with the back of the Escort.

After the impact, Carney and Balgemann, the driver of the Escort, both exited their vehicles and inspected them for damage. Upon ascertaining that there was no damage to either car, they returned to their cars and Balgemann drove away. Before Carney could begin driving again, however, his car was struck from behind by Smith's truck. Carney heard a "tremendous bang" and was thrown back against his seat. He hit his head on the headrest and the force of the impact caused the seat to collapse under him. He felt a sharp pain in his neck and then lost consciousness. When he regained consciousness, he was very disoriented and did not understand where he was or what had happened. He then noticed Smith standing outside his car. Smith apologized to him and told him that he had tried to stop, but because the truck was empty, it was "skipping" on the road.

Immediately after the accident, Carney went to work, but he felt groggy and disoriented. He had a stiff, sore neck and pain in his lower back. Over the next few days, he began to feel better, and the back pain became reasonably moderate so that it was not causing him any difficulty. He was able to work three days the following

week, but on Thursday he had to leave work because he could no longer stand the back pain.

Approximately one month after the accident, Carney had a CAT scan performed, which revealed that he had a herniated disc. In September 1987, he received an epidural steroid injection, which relieved the pain for about six months. Every three to six weeks for the following year, he experienced periods of back spasms and lower back pain which lasted two to three days. In October 1988, he had an MRI performed which confirmed the disc herniation. In August 1989, he received another steroid injection, but it provided no relief.

In February 1990, Carney saw Dr. Rene Pecson, a neurosurgeon. He told Pecson that he suffered from severe back pain on his left side which radiated to his left leg, and caused back spasms and numbness in both legs. Pecson diagnosed his problem and suggested a laminectomy to repair the herniated disc. The surgery was performed in April 1990.

As a result of the surgery, the spasms stopped and about two months later, Carney was able to return to work, part time. Although the symptoms disappeared from his left side, by September 1990, he began to experience spasms and numbness on his right side. Pecson advised him to undergo pain management therapy at the Marionjoy Rehabilitation Center in Wheaton. Pecson also told him that if he did not respond to the therapy within a few months, surgery on his right side might be necessary. On December 12, 1990, he went to Marionjoy and began receiving physical therapy three times a week.

Carney testified that he experienced periods of severe pain every four to six weeks that lasted anywhere from a few hours to as long as a day. He stated that he was unable to do any strenuous physical activity, but in between the periods of severe pain he was able to "function fairly normally." He explained that he was able to "do the day-to-day things that are necessary *** to get by in life." He stated that "getting cleaned up in the morning, dressing, doing daily household chores, [and] working on [his] car are not a problem."

Ronald Chandler testified that he had known Carney for more than 12 years, and that before the accident, they would often go hiking, skiing, bicycling, and walking. They no longer engaged in those activities except for walking, but since the accident Carney could walk only one mile when he previously could walk 12. Chand-

ler also stated that when Carney came to his house, he sat on the floor because "[h]e stiffens up if he sits in a chair."

Barbara Chandler testified that she had known Carney for approximately 10 years and that, before the accident, he and her husband, Ronald Chandler, often engaged in physical activities. She stated that since the accident, Carney "always seems uncomfortable" and that he was more quiet and edgy than before.

Edith Booras testified for Carney that she had worked with him for about nine years and that, prior to the accident, he was an energetic person who was always running around. She stated that since the accident he always appeared to be in pain and dragged his foot when he walked.

Thomas Swiontek, Carney's former supervisor, testified that he never observed anything after the accident that restricted Carney's ability to perform his duties. Linda Acevedo, Carney's current supervisor, testified that she noticed him moving stiffly before the surgery and that he walked a little slower.

Dr. Rene Pecson testified for Carney that he performed the laminectomy and that, by November 1990, Carney was progressing well. At that time, Carney complained of back spasms and numbness of the right thigh, and Pecson recommended that he go to the Marionjoy Rehabilitation Center. Pecson warned Carney that surgery might be necessary if he did not respond to conservative treatment. Pecson testified that while surgery on Carney's right side may be necessary in the future, he could not say whether the pain and spasms will be permanent.

Dr. Norman Aliga, a doctor at Marionjoy, testified for defendants that he examined Carney in December 1990, and recommended physical therapy three times a week in order to treat Carney's lower back pain. Aliga explained that Carney suffered from a bulging disc, rather than a severe herniation. He stated that Carney had normal muscle strength on his upper and lower extremities, except for the muscle that extends to his right knee. Aliga also stated that Carney experienced pain when he tried to raise his right leg straight up, and that he had a tight muscle on his right side. Aliga concluded that Carney would experience a "sufficient level of discomfort," but that the condition was not permanent and that he did not anticipate surgery in the foreseeable future.

Dr. John Gleason, an orthopedic surgeon, testified for defendants that he examined Carney in July 1990, and found him favoring his right side with a slight pitch to the right, something seen in about 5% of cases after surgery. Gleason noted that although Car-

ney had some difficulty bending forward, his lateral movement was normal. He stated that the results of the lower back tests were normal, and that there was no spasm or tenderness on either side. Gleason stated that in his opinion, Carney would not require any further surgery, but it remained a possibility.

Michele Johnson testified for defendants that she was a private investigator, employed by In-Photo Surveillance, Inc., and that in December 1990, she was assigned to place Carney under surveillance. Three tapes were made after several hours of surveillance, but they were limited in content because of the need to remain undercover. In all the time she spent on surveillance, she never observed Carney taking part in any form of physical exercise or visiting a health club. Two tapes were shown to the jury during her testimony, and she explained the circumstances surrounding each.

The first tape was taken on December 14 and 15, 1990, and was 38 minutes long. That tape showed Carney entering and exiting a two-seat sports car on several occasions and lifting grocery bags from a cart and placing them in the trunk of the car. Most of the tape showed Carney helping an unidentified person repair the front bumper of a car. Carney was shown crouching down in order to tie a chain around a tree and then attaching the chain to the bumper. Carney then entered the car and placed it in reverse many times in order to pull the bumper off the car. Carney was also shown lifting and carrying the bumper. The second tape was taken on December 30, 1990, and was eight minutes long. It showed Carney walking through snow and using a broom to brush snow off a car.

In rebuttal, Carney called Johnson and showed the third videotape, which was taken on October 28, 1990 and was two minutes long. It showed Carney walking, getting into his car, driving, and pumping gas into his car. Johnson stated that the third tape was taken by another In-Photo employee and not by her. Carney also called Timothy Kizorek, a vice-president of In-Photo. Kizorek acknowledged that his firm began its surveillance of Carney in July 1989, and that the total cost incurred by defendants to conduct the surveillance was approximately $10,000.

As previously indicated, the jury found that Carney had suffered $153,000 in damages, but determined that he was 50% at fault and reduced the award accordingly, for a total judgment of $76,500. Carney's post-trial motion was denied by the circuit court. This appeal followed.

Carney first contends that the circuit court abused its discretion when it admitted the videotapes. He asserts that the tapes were

not relevant because rather than address a matter in controversy, they merely "confirmed [his] contention that, between spasms of pain, he is able to conduct normal day to day activities." Moreover, Carney argues that any probative value of the tapes was outweighed by their prejudicial effect. He contends that the fact that the tapes were taken covertly left the jury with the "distinct and unavoidable impression that *** [he] had been caught in a lie." Defendants respond that the tapes were relevant because they showed Carney's physical condition and the extent of his incapacitation and were therefore properly admitted. We agree with defendants.

■■ It is well established in Illinois that films and videotapes, when properly authenticated and relevant, are admissible as demonstrative evidence. (*Cisarik v. Palos Community Hospital* (1989), 193 Ill. App. 3d 41, 44, 549 N.E.2d 840, 841, *aff'd in part & rev'd in part* (1991), 144 Ill. 2d 339, 579 N.E.2d 873.) A film will be considered relevant as long as its probative value is not substantially outweighed by the danger of unfair prejudice (*Georgacopoulos v. University of Chicago Hospitals & Clinics* (1987), 152 Ill. App. 3d 596, 599, 504 N.E.2d 830, 832); its admission into evidence is within the sound discretion of the circuit court. (*Missouri Portland Cement Co. v. United Cement, Lime, Gypsum & Allied Workers International Union, Division of Boilermakers, AFL-CIO, Local No. 438* (1986), 145 Ill. App. 3d 1023, 1027, 496 N.E.2d 489, 491.) Furthermore, the law is well settled that films demonstrating the extent of the injuries are admissible, and the fact that a film was made covertly rather than openly is immaterial. (See *Cisarik v. Palos Community Hospital* (1991), 144 Ill. 2d 339, 579 N.E.2d 873.) Such considerations relate to the weight of the evidence, rather than to its admissibility.

■ This court has twice held that surveillance films may be used to expose a malingering plaintiff. (See *Mathias v. Baltimore & Ohio R.R. Co.* (1968), 93 Ill. App. 2d 258, 236 N.E.2d 331; *McGoorty v. Benhart* (1940), 305 Ill. App. 458, 27 N.E.2d 289.) In *Mathias*, the appellate court held that the circuit court erred when it refused to allow an in-court presentation of motion pictures which demonstrated the plaintiff's physical capabilities. (*Mathias*, 93 Ill. App. 2d at 263-64, 236 N.E.2d at 335.) The plaintiff claimed to be incapable of using moving equipment as a result of being struck on the head by a ladder, but conflicting testimony as to his capacity to work was presented at trial. (*Mathias*, 93 Ill. App. 2d at 264, 236 N.E.2d at 334-35.) The appellate court reversed the circuit court's

ruling and remanded the case for a new trial because it believed that in light of the conflicting testimony, a film showing the plaintiff working around his house, including riding a lawn mower, was relevant to the issues in the case. *Mathias*, 93 Ill. App. 2d at 263-64, 236 N.E.2d at 334-35.

Similarly, in *McGoorty v. Benhart*, the court held that surveillance films of the plaintiff were admissible to show that his injuries were not as severe as he claimed. (*McGoorty*, 305 Ill. App. at 469, 27 N.E.2d at 294.) In that case, the plaintiff testified that after a car accident he was unable to exercise without wearing a neck brace. Also, his doctor testified that he walked stiffly and could not bend down past his knees. (*McGoorty*, 305 Ill. App. at 466-67, 27 N.E.2d at 293-94.) The defendant offered a movie, however, which showed the plaintiff playing golf, tossing a basketball, throwing baseballs, rowing a boat, and swimming, all without wearing his brace. (*McGoorty*, 305 Ill. App. at 466, 27 N.E.2d at 293.) The court held that the films were properly admitted because they impeached the doctor's testimony and tended to show that the plaintiff was not as badly injured as he claimed. *McGoorty*, 305 Ill. App. at 467, 27 N.E.2d at 294.

■ While we recognize that the videotapes in the instant case are not as clearly impeaching as the films in *Mathias* and *McGoorty*, we consider them to be probative because they tend to disprove matters that were in controversy. Carney is correct in asserting that the tapes corroborate both his testimony and the medical testimony that he is able to perform ordinary tasks without difficulty during the periods between the painful attacks. Nevertheless, he presented other evidence that raised the inference that his limitations were much more severe. The testimony by the Chandlers and Edith Booras implied that Carney was always in pain and could barely sit still without suffering. In contrast to their testimony, the videotapes showed Carney moving effortlessly while getting in and out of his car, carrying numerous objects, and performing various tasks. Although none of the activities depicted in the tapes required vigorous exertion, they were sufficient to rebut the inference that he was constantly in pain. Thus, the tapes had probative value concerning the issue of the extent of Carney's injuries.

Moreover, we fail to see the prejudice that Carney allegedly suffered from the admission of the tapes. As he has admitted, many parts of the tapes were consistent with his theory of the case. In fact, he showed one of the tapes to the jury himself. While we do

not agree with defendants that Carney waived any error by doing so, we cannot conclude that the prejudicial effect of the tapes outweighed their probative value. Therefore, we find no abuse of discretion in the circuit court's admission of the videotapes into evidence.

■ Carney also contends that he is entitled to a new trial because the jury's verdict was against the manifest weight of the evidence. He argues that the only evidence supporting the jury's allocation of fault was Smith's statement that Carney made a sudden lane change in front of him, testimony that he portrays as implausible and not credible. He further asserts that the damage award would have been much higher if not for the covert videotape evidence, because neither Gleason nor Aliga contradicted Pecson's testimony that he may need surgery in the future. Defendants respond that the verdict was not against the manifest weight of the evidence because the record contains facts that the jury could properly rely upon to determine that Carney entered the right lane just before the accident, rather than three miles earlier as he claimed.

In determining whether a jury verdict should be set aside, a reviewing court must decide whether the verdict was against the manifest weight of the evidence. (*Pharr v. Chicago Transit Authority* (1991), 220 Ill. App. 3d 509, 521, 581 N.E.2d 162, 169.) A verdict is considered to be against the manifest weight of the evidence only if an opposite conclusion is clearly evident or if the jury's verdict is palpably erroneous. *Reid v. Sledge* (1992), 224 Ill. App. 3d 817, 820, 587 N.E.2d 1156, 1159.

In the instant case, we do not believe that an opposite conclusion is clearly evident or that the jury's determination of fault was palpably erroneous. We first note that the jury properly could have found that Carney's contributory negligence was evidenced by the simple fact that he collided with the car in front of him. Although, as our summary of the testimony at trial shows, there was conflicting evidence between the parties as to how the collision occurred and the periods of time that separated the various collisions, these are fact questions uniquely within the province of the jury to determine.

A jury's verdict will not be set aside merely because a different conclusion could have been reached from conflicting testimony. (*Hamrock v. Henry* (1991), 222 Ill. App. 3d 487, 492, 584 N.E.2d 204, 208-09, *appeal denied* (1992), 144 Ill. 2d 633, 591 N.E.2d 22.) It is the function of the jury to weigh the evidence and determine whether or not certain conduct is negligent. (*Johnson v. Colley*

(1986), 111 Ill. 2d 468, 475, 490 N.E.2d 685, 688, *cert. denied* (1986), 479 U.S. 830, 93 L. Ed. 2d 60, 107 S. Ct. 113.) Because an appellate court will not substitute its judgment for the fact finder's (*Gibson v. State Farm Mutual Automobile Insurance Co.* (1984), 125 Ill. App. 3d 142, 150, 465 N.E.2d 689, 692), there is no basis for reversal here.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and McCORMICK, J., concur.