FOURTH DIVISION

No. 1-06-2418

| | | |
|---|---|---|
| VINCENT DONNELLAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 02 L 11569 |
| | ) | |
| FIRST STUDENT, INC., | ) | |
| | ) | Honorable Arthur L. Janura, Jr. |
| Defendant-Appellant | ) | Judge Presiding. |
| | ) | |
| (Earl F. McClendon, | ) | |
| | ) | |
| Defendant.) | ) | |

JUSTICE MURPHY delivered the opinion of the court:

On February 11, 2002, plaintiff Vincent Donnellan's cargo van was rear-ended by a school bus driven by an employee of defendant First Student, Inc. Plaintiff, 31 years old on the date of the accident, had no adverse health issues at the time. Plaintiff alleged in his complaint that, as a result of the accident, he suffered numerous permanent physical and mental injuries. Defendant conceded its negligence in the accident, but disputed that the accident was the proximate cause of plaintiff's alleged injuries.

On April 7, 2006, following several days of trial, the jury returned a verdict in favor of plaintiff for $6 million. Defendant seeks reversal of the jury verdict or, alternatively, reversal of the damages award and remand for new trial on damages or substantial remittitur. Defendant

argues that the trial court abused its discretion and committed prejudicial error in allowing plaintiff's day-in-the-life video as demonstrative evidence but barred defendant's surveillance video. Defendant also argues that it was prejudiced by several evidentiary errors and the trial court's instructions to the jury. For the following reasons, we affirm the verdict of the jury.

## I. BACKGROUND

On September 11, 2002, plaintiff filed a complaint against defendant and Earl F. McClendon for injuries allegedly suffered due to defendant's negligence in the February 11, 2002, accident. At the time, McClendon was defendant's employee and driving the school bus that rear-ended plaintiff. Prior to trial, McClendon was voluntarily dismissed and defendant admitted negligence.

Prior to the commencement of trial on the issues of causation and damages, the trial court heard the parties' motions *in limine*. At issue on appeal are the trial court's decisions regarding plaintiff's day-in-the-life video, a surveillance video completed for defendant, and, following a hearing pursuant to *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), testimony on the results of a "Single Photon Emission Computer Tomography" (SPECT) scan of plaintiff's brain.

### A. Plaintiff's Day-In-The-Life Video

The parties and the trial court watched the day-in-the-life video that the trial court described as a 4.5-minute video of plaintiff arriving at his therapist's office and going through physical therapy. Defendant argued that the video was not demonstrative, but substantive medical evidence, and that the audio and video depicted plaintiff in pain during his therapy session. Defendant claimed that it was at a disadvantage from the late disclosure as it could not

2

depose the therapist or videographer before trial. The trial court found that, with the proper foundation from someone with personal knowledge that the video truly and accurately depicts what it shows, the video would be allowed as demonstrative evidence without audio. The trial court further granted defendant the right to depose the physical therapist in the video.

### B. Defendant's Surveillance Video

Plaintiff sought to bar the use of a surveillance video defendant had taken of plaintiff less than two months before trial. Two days before the case was assigned for trial, defendant produced a copy of the video to plaintiff. Plaintiff asserted that the video was produced at such a late date that he was prejudiced by his inability to explore the content of the video with any witnesses. Furthermore, plaintiff argued that the videotape was edited from the total film taken and sped up in such a way that it was not an accurate portrayal of plaintiff's physical abilities.

Defendant argued that the surveillance video was relevant to the jury's determination of the effect of the injury on plaintiff's daily lifestyle. Defendant also argued that the late disclosure was not an issue, especially in light of the day-in-the-life video that was produced the day before trial. The trial court granted the motion to bar the surveillance video at that time to allow an opportunity for the court to review the video. The parties agreed not to mention the video during opening argument.

At the end of plaintiff's case, the trial court revisited the issue and held a foundational hearing. Defendant presented the testimony of Michael Kobliska, the private investigator who conducted the surveillance of plaintiff on February 9, 2006. Kobliska testified that he took the video with a Super 8 camera and the original tape was then converted to compact disc format by

3

a third party. Kobliska did not know if the video was compressed or edited. However, he admitted that some actions noted in his report were not shown in the video.

In response, plaintiff offered the testimony of Steven Grant, a media expert. Grant testified to the effect of converting a Super 8 tape to MPEG computer file on compact disc. Grant indicated that this process compresses a file from 10,000 megabytes to 400 megabytes. He opined that this results in "tremendous changes" in the file.

In rendering its decision, the trial court first noted that there were issues with defendant's failure to disclose Kobliska as a witness during discovery and to seasonably supplement discovery. The trial court stated that it would not consider the copied videos because it had the original and the copies had been altered by the compression process. The trial court barred the original video solely on a balancing of the probative value of the video and the possibility of prejudice to plaintiff.

The trial court noted that defendant was offering the video as demonstrative evidence, but, pursuant to *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 284-85 (2003), it could not allow the video if the threat of prejudice substantially outweighed the probative value of the video. The trial court found that the video had no probative value because it did not prove or disprove any facts at issue. However, the threat of prejudice was determined to be substantial because throughout the video, the view is obstructed. The trial court found that it is impossible to determine what activity is going on and if plaintiff is doing any work. It opined that this could prejudicially give the jury the impression that plaintiff was able to complete extensive work without pain.

## C. The *Frye* Hearing

Defendant also objected to the use of the SPECT scan and testimony regarding the analysis of the scan. Defendant requested a *Frye* hearing on the SPECT scan technology. Plaintiff presented the testimony of Dr. Dan G. Pavel, who testified that he was board certified in nuclear medicine. Pavel testified that he was currently affiliated with the University of Illinois at Chicago Hospital as a professor and had served an 11-month sabbatical with the National Institute of Health from 1995 to 1996.

Pavel explained that a SPECT scan measures the amount of activity over an organ, in this case the brain, by detecting tracer compounds injected into the patient. Pavel testified that he had been involved with SPECT scans for about 14 years, including lecturing and publishing articles on their use in brain trauma, and that they have been in wide use in hospitals throughout the country for more than 20 years. Pavel testified that several articles on SPECT scans and brain trauma had been written over that time but that the technology was continually evolving.

Because of his years of experience, Pavel was able to identify abnormalities in plaintiff's SPECT scans and make a differential diagnosis as to potential causes. Pavel testified that, with the patient's history and the SPECT scan results, he concluded that the injuries were consistent, within a certain level of probability, with a traumatic brain injury. Pavel admitted that he did not compare plaintiff's scan with that of a "normal" baseline scan, but stated that no such scan exists and he could only base his conclusion on his years of experience of reviewing SPECT scans.

Pavel also admitted that he could not opine that a traumatic brain injury caused the abnormalities, but only that they were consistent with such an injury. Pavel responded that false

positives could, theoretically, be caused by a patient's medication but, practically, this was very unlikely. Accordingly, the trial court found that Pavel could not testify that the SPECT scan allowed him to opine on a causal connection, but would be limited to stating, based on studies, literature and his own experience, that the scan was consistent with a patient with a traumatic brain injury.

### D. Plaintiff's Testimony

Plaintiff testified that he was born in Ireland in 1971 and moved to the Chicago area in 1996 where he found work as a carpenter. In 2000, plaintiff started an excavating company with a friend. In addition, he started a business that framed out residential buildings. At the time of the accident, plaintiff was driving his cargo van, which contained various tools and a generator separated from the front seats by a metal cargo cage. Plaintiff was stopped in the left lane, preparing to make a left turn. When plaintiff bent down to pick something up, McClendon rear-ended the van with the school bus. Plaintiff was hit in the back of the head by either the generator or a power tool that broke through the cargo cage and hit plaintiff. The van was pushed through the intersection and down into a ditch and rendered inoperable.

Plaintiff testified that he was dizzy and had a headache, but he refused treatment at the scene of the accident. A friend drove him home, where he went to bed. Later that day, plaintiff felt great pain and continued to have a headache so he went to the emergency room. Plaintiff was diagnosed with a cervical strain. Two days later, plaintiff returned to the emergency room due to pain in the lower back and neck.

Plaintiff testified to the years of consultations, treatments, and physical therapy he had

6

received, and continued to receive, to treat his headaches and pain and sleep and vision problems and to work on regaining mobility. Plaintiff takes several medications but could not recall which types. For a period of time, plaintiff received painful steroid shots in the base of his neck to treat his headaches. While these treatments seemed to work, they were discontinued as plaintiff began to feel pain beyond the treatment time in the area that he received the shots. Plaintiff also continued to receive Botox treatments to try and strengthen his leg.

Plaintiff testified to his typical day and week. On Monday and Thursday, plaintiff attends therapy. On the other days of the week, plaintiff works for his friend Gavin Nicholas, as his health allows. Plaintiff works in a supervisory capacity at construction sites, assuring that the laborers, tradesmen and contractors are coordinated. After the accident, plaintiff obtained his commercial driver's license on his fourth attempt. While he still drives his car short distances, plaintiff can no longer drive trucks or operate heavy machinery. Plaintiff testified that he often has to close one eye and tilt his head to see properly when driving.

Plaintiff's wife, Rosanne Donnellan, a pediatrician, testified that she and plaintiff were engaged on December 24, 2001, and married on May 25, 2002, and that she was pregnant with their first child. Rosanne testified that she first noticed plaintiff's leg starting to turn in a few months after the accident until it eventually was turned in at all times. Rosanne stated that plaintiff had regular headaches, back spasms, vomiting due to pain, and sleep problems. In addition, plaintiff complained of double vision and, as a result, he no longer reads for enjoyment.

Rosanne testified that plaintiff suffers serious memory lapses. She testified that she was worried that this was a danger to plaintiff and their household. Rosanne also testified that

7

plaintiff's problems have resulted in a drastic decrease in the couple's attendance at social functions because plaintiff does not want to suffer pain or people looking at him.

Gavin Nicholas, a contractor, met plaintiff in 1999 and remains his close friend. Nicholas testified that plaintiff continues to work for him as a supervisor at construction sites. Plaintiff does not complete any labor or operate machinery, but he coordinates laborers and tradesmen to assure that work is getting done. Nicholas stated that plaintiff works as he is physically able and that he frequently takes breaks during the day, sometimes returning home or to Nicholas' home to take a nap.

### E. Plaintiff's Diagnosis and Treatment

Dr. Gary M. Yarkony, board certified in physical medicine and rehabilitation since 1982, first saw plaintiff on July 12, 2002. Plaintiff complained of neck and back pain when he visited Yarkony. Yarkony suspected that plaintiff was suffering from a brain injury, including a cranial nerve injury that was causing a problem with plaintiff's eye muscle. Yarkony stated that this type of injury is typically associated with traumatic brain damage and he ordered an MRI of plaintiff's brain. Yarkony testified that the MRI did not demonstrate any issues and he utilized the later SPECT scan, which identified a brain injury, in his diagnosis. Yarkony also noted that he first observed plaintiff walking with an unusual gait on July 16, 2003, during his visit. Using a "little rehab doctor trick," he observed plaintiff walking in the parking lot as he left the examination to assure it was not an act.

Yarkony testified that plaintiff suffered a *coup contre coup* injury, meaning an injury to the brain at the site of impact, the back of plaintiff's brain, and the opposite side, the front of his

brain. In addition, Yarkony diagnosed plaintiff with fourth nerve palsy, dystonia, myofascial pain, allodynia, occipital neuralgia, and depression. The result of these ailments are hypersensitivity to pain, cognitive dysfunctions, double vision, headaches, sleeping and mood problems and decreased ability to walk. Yarkony opined that plaintiff's symptoms will all naturally worsen as plaintiff ages and his body deteriorates.

Yarkony admitted that he did not diagnose dystonia or allodynia without input from plaintiff's wife. Yarkony stated that Rosanne first suggested that both of these ailments were possible and he admitted that he ultimately diagnosed plaintiff with them, because "she was right." Yarkony also admitted that he referred plaintiff to a movement disorder specialist in Chicago, but Rosanne took plaintiff to see a specialist at the Cleveland Clinic who did not diagnose plaintiff with dystonia.

Dr. Michelle Muellner of the Rehabilitation Institute of Chicago (RIC) testified that she treated plaintiff from April 2003 to July 2004 at the RIC chronic pain center. Plaintiff initially complained principally of neck and lower-back pain. Muellner initially concluded that plaintiff suffered chronic low-back pain with severe myofascial pain with both physical and psychological components. Muellner explained that chronic myofascial pain arises when the brain replicates the pain signal for the myofascial pain, pain between the muscle and connective tissues and ligaments, into a continual pain.

Muellner did not find evidence of neurologic compromise in her original diagnosis. Muellner testified that she was concerned that plaintiff was simulating or magnifying the symptoms and that he had exhibited several signs that triggered this fear, a concern that

plaintiff's prior treating physician had shared with Muellner. However, she opined that he was not consciously exaggerating his symptoms.

Muellner testified that she was concerned that pending litigation was a stressor that could increase pain and prolong treatment. Muellner also was concerned that plaintiff's wife had too much of an active a role in his treatment. She feared that this could inhibit his treatment as plaintiff would less readily take on his recovery, accept his injuries and move on in his rehabilitation. Muellner also advised plaintiff, who continued to work full-time during the early phase of her treatment of him, to pace himself or he would not have successful treatment.

Upon plaintiff's discharge from Muellner's care on July 13, 2004, her concluding diagnosis of plaintiff's injuries remained chronic myofascial pain and traumatic brain injury. Muellner opined that plaintiff's conditions resulted from the automobile accident at issue in this case. Muellner also testified that plaintiff would continue to suffer pain and memory loss as a result of his injuries and that he would not be able to return to his prior jobs as an excavator and carpenter.

Plaintiff presented the evidence deposition of Dr. James Kelly, a board-certified neurologist who, upon referral from Dr. Muellner, saw plaintiff twice in April and May 2003. Kelly testified that he diagnosed plaintiff with fourth cranial nerve palsy, which causes plaintiff's right eye to drift down, affecting plaintiff's motor skills and ability to read and drive. Kelly also determined that plaintiff suffered from a mild form of concussion or mild traumatic brain injury due to the symptoms he presented including headaches, migraine headaches, occipital neuralgia, dystonia, memory loss, sleep disturbances and personality changes. Kelly opined that these

10

conditions were a result of the biomechanical injury suffered in the accident. Kelly did not believe that plaintiff was exaggerating his symptoms or that he was a malingerer. Kelly prescribed medications in addition to those prescribed by Muellner.

From November 11, 2003, to December 2005, Drs. Anita Rao and Santhanam Suresh, anesthesiologists at Children's Memorial Hospital, treated plaintiff for his headaches caused by occipital neuralgia. Rao testified at trial that Suresh, a pediatric specialist, had administered about 12 occipital nerve blocks to plaintiff. Rao related that these blocks involve several injections of local anesthetic into the base of the skull where the occipital nerve lies and they provide temporary relief of head and neck pain. These treatments were successful, but Suresh referred plaintiff to her so he could see an adult pain specialist.

Rao testified that she administered five additional occipital nerve blocks to plaintiff. In addition, Rao performed a radio frequency thermal ablation procedure in the hope of providing longer-lasting relief to plaintiff. This procedure involves insertion of a small needle with a current attached to it into the area of the nerve that heats up the area and slows down the firing of the nerve causing the pain. Rao testified that these treatments helped decrease plaintiff's pain but that at the end of the treatment period he was still suffering from headaches.

Dr. Pavel testified about the relationship of blood flow to the function of the brain and the SPECT scan that was administered in September 2004. Pavel testified at length about symptoms that result from decreased function in different areas of the brain. Consistent with the court's ruling on defendant's motion *in limine* following the *Frye* hearing, Pavel testified that the SPECT scan of plaintiff's brain presented some of these abnormalities and that they were

11

consistent with a traumatic brain injury. Pavel testified over objection that it was his opinion the abnormalities identified in the SPECT scan were permanent in nature.

Plaintiff presented the evidence deposition of Dr. J. Jerry Rodos, a board certified osteopathic physician practicing psychiatry, who first saw plaintiff on August 24, 2006. Rodos prescribed a brain SPECT scan to help determine what was happening in plaintiff's brain. Rodos testified that Dr. Pavel found that plaintiff's SPECT scan revealed a pattern of blood flow consistent with a traumatic brain injury.

Rodos ultimately diagnosed plaintiff as having headaches, chronic pain, double vision, memory and personality changes, and dystonia, a nerve injury that caused plaintiff's posture to tilt and his left foot to point inward. In addition, as a result of these conditions, Rodos found that plaintiff suffers from depression. Rodos concluded that all of these conditions resulted from the traumatic brain injury suffered in the car accident.

Rodos prescribed aquatherapy, neurobiofeedback, acupuncture, and various topical creams to treat these conditions. Rodos utilized additional medication and therapy to treat plaintiff's depression. Rodos also recommended vocational therapy to plaintiff, but he has not been willing to embrace that therapy. Although Rodos opined that plaintiff has not made great progress in understanding the nature of his injuries, he affirmatively stated that he was not a malingerer.

Dr. Robert Kohn, a neuropsychiatrist and board-certified neurologist, testified that he saw plaintiff in January and April of 2005 as a consulting physician at Rodos' request. Kohn testified that he had experience in using SPECT scans and that he had authored several articles with Pavel

on the subject. Kohn explained the SPECT process and testified that he reviewed plaintiff's SPECT scan and, over objection, that it was consistent with a *coup contre coup* brain injury.

Kohn also testified that both plaintiff and his wife were present for the first examination and he interviewed both of them regarding plaintiff's health issues and history. Kohn testified that plaintiff appeared physically uncomfortable with dystonic posturing. After physical examination, review of plaintiff's file, scans, and medical and family history during his two office visits, Kohn concluded that plaintiff suffered from post-traumatic brain injury and dystonia, fourth cranial nerve palsy, and possibly occipital neuralgia. Kohn opined that the likely cause of plaintiff's conditions was the impact to the back of the head during the accident.

The evidence deposition of Dr. Jennifer Pallone, a board-certified neurologist, who was referred by Dr. Rodos to treat his pain and muscle spasms, was also presented. Pallone testified that she first saw plaintiff on September 19, 2005, and diagnosed him as suffering from closed head trauma, chronic headaches, and segmental dystonia. Pallone prescribed Botox injections to treat his dystonia and headaches. Pallone testified that the Botox injections help reduce muscle spasms and provide temporary relief of dystonia symptoms

### F. Defendant's Witness

As its sole witness, defendant presented the testimony of Dr. Robert Heilbronner, a clinical neuropsychologist, who examined plaintiff on December 8, 2005. Heilbronner testified that he reviewed the file of Dr. Jerry Sweet, a neuropsychologist at CRI who evaluated plaintiff on May 21, 2003, and May 28, June 2, and June 4, 2004. Sweet concluded that he could not properly estimate plaintiff's abilities because plaintiff had given a variable or insufficient effort

13

during his evaluations. He also opined that plaintiff had somatization disorder - a preoccupation with physical symptoms without a physical cause.

Heilbronner concurred with Sweet's opinions and concluded that plaintiff suffered from conversion disorder, a psychiatric condition, and not a brain injury or other medical condition. Heilbronner bolstered this diagnosis with his conclusion that Rosanne was overly nurturant to the point of co-dependency and the issue of litigation caused plaintiff's complaints to persist. Heilbronner did not claim that plaintiff did not suffer the various symptoms identified above, but opined these symptoms were exacerbated and continued due to the psychosocial reinforcers. Heilbronner admitted that plaintiff suffered the fourth cranial nerve injury and symptoms of left leg pain, neck pain and headaches as a result of the accident. However, he testified that comprehensive psychiatric treatment would significantly improve all aspects of plaintiff's condition.

G. Jury Instructions and Verdict

During the jury instruction conference, defendant sought to instruct the jury to not consider or include any amounts for loss of earnings, profits, salaries or benefits in any award for damages. The trial court refused defendant's tendered instruction regarding any evidence of a wage loss claim, stating that defendant could argue the issue in closing. The jury deliberated and returned a verdict of $6 million for plaintiff. The jury itemized the award on the jury form as $82,500 for the stipulated past medical expenses, $3,417,500 for disability experienced and expected in the future, $500,000 for disfigurement, and $2 million for past and future pain and suffering. The trial court denied defendant's posttrial motion and this appeal followed.

14

## II.  ANALYSIS

### A.  Evidentiary Issues

#### 1. *Plaintiff's Day-in-the-Life Video*

Defendant first argues that the trial court erred in admitting plaintiff's physical therapy video as demonstrative evidence.  Defendant asserts that the video was not timely disclosed, an insufficient foundation was laid, and it improperly focused on plaintiff's discomfort to elicit sympathy from the jury.  Defendant argues that the failure to bar the video, especially in light of the trial court's decision to bar defendant's surveillance video, discussed below, resulted in reversible error.  We review a trial court's admission of a day-in-the-life video for an abuse of discretion, which occurs only when no reasonable person would agree with the decision of the trial court.  *Velarde v. Illinois Central R.R. Co.*, 354 Ill. App. 3d 523, 529 (2004).

Plaintiff's video, shot on March 17, 2006, is approximately five minutes long and contains footage of plaintiff exiting his car, walking into the rehabilitation center, and undergoing therapy on his leg and foot.  Plaintiff produced the video to defense counsel on March 29, 2006, the day before trial proceedings began.  Defendant argues that because the video was not disclosed until such a late date, in addition to the failure to disclose the physical therapist as a trial witness, it was deprived of any opportunity to challenge the evidence.  Defendant contends that this evidence should have been barred pursuant to Rule 219(c).  210 Ill. 2d R. 219(c).

Defendant continues to argue that plaintiff's video was not a day-in-the-life video as it did not simply demonstrate plaintiff's daily tasks and functions.  *Velarde*, 354 Ill. App. 3d at 535.  Defendant points to several instances in the video where plaintiff grimaces and presents

expressions of pain while his foot is manipulated by the therapist. Accordingly, defendant contends that the video was not demonstrative in any way but, rather was substantive evidence improperly presented to bolster plaintiff's case and claim for damages, prejudicing defendant's case. *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 169 (2006); *French v. City of Springfield*, 65 Ill. 2d 74, 82 (1976).

Defendant points out that this case is unlike *Georgacopoulos v. University of Chicago Hospitals & Clinics*, 152 Ill. App. 3d 596 (1987). In *Georgacopoulos*, this court affirmed the admission of a day-in-the-life video that included a portion where the plaintiff undergoes a painful physical therapy session. The court noted that the therapy session was only a portion of the 19-minute video and that the trial court described the tape as " 'tasteful.' " *Georgacopoulos*, 152 Ill. App. 3d at 599. The court further distinguished that case from a federal case that found a day-in-the-life video more prejudicial than probative because it only showed a physical therapy session of the plaintiff that had suffered severe burns. *Georgacopoulos*, 152 Ill. App. 3d at 599, citing *Thomas v. C.G. Tate Construction Co.*, 465 F. Supp. 566, 569 (D. S.C. 1979). Defendant argues that, as in the *Thomas* case, plaintiff's video was only of his physical therapy session and the display of pain by plaintiff was therefore more prejudicial than probative.

Finally, defendant argues that no proper foundation was laid for the video as required in *Spyrka*. *Spyrka*, 366 Ill. App. 3d at 167. The video was shown during Rosanne's testimony. She was not present during the filming and she did not explain what was contained in the video. Defendant asserts that the fact that Rosanne had been to prior therapy sessions was not sufficient to lay a proper foundation. *Cryns*, 203 Ill. 2d at 284-85.

16

Plaintiff responds that as demonstrative, not substantive, evidence, a day-in-the-life video is not subject to the same disclosure requirements as substantive evidence and therefore there was no discovery violation. *Velarde*, 354 Ill. App. 3d at 530-31. Furthermore, plaintiff asserts that the physical therapist was listed in plaintiff's discovery responses and the trial court granted defendant the opportunity to depose her. The therapist appeared in response to plaintiff's trial subpoena, yet defendant did not question her. In addition, plaintiff notes that defendant had every opportunity to question plaintiff himself on cross-examination but did not.

Plaintiff asserts that the trial court properly rejected defendant's argument that the video was more documentation of a medical examination than demonstrative day-in-the-life evidence. Plaintiff notes that our courts have stated that day-in-the-life videos constitute demonstrative evidence which helps jurors understand witness testimony. *Cisarik v. Palos Community Hospital*, 144 Ill. 2d 339, 341 (1991); *Velarde*, 354 Ill. App. 3d at 530-31. Plaintiff contends that defendant's argument rests on the inaccurate claim that the video so focused on plaintiff's pain and effort that it was prejudicial as the video distinguished by *Georgacoupoulos*.

Plaintiff concludes that a proper foundation was laid by Rosanne, who testified that she had attended two physical therapy sessions in the past. She testified that the video accurately depicted how plaintiff exits his car, how he walks, and how his physical therapy is administered. Plaintiff argues that this is all that is required by *Spyrka* and *Cryns* to properly lay a foundation for demonstrative video evidence.

First, we agree that *Velarde* provides that, pursuant to *Cisarik*, day-in-the-life videos are demonstrative and not substantive videos. In addition, the very purpose of these videos is to

17

illustrate evidence regarding a party's life at the time of trial. Accordingly, the disclosure prior to trial was not prejudicial. *Velarde*, 354 Ill. App. 3d at 531-32. As succinctly outlined in *Cisarik*, a day-in-the-life video is akin to a photograph and admissible if a foundation is laid by someone having personal knowledge of the filmed object and that the video is an accurate portrayal of that. The video's probative value also must not be substantially outweighed by the danger of prejudice. *Cisarik*, 144 Ill. 2d at 342.

Rosanne certainly knew plaintiff and could testify to his ability to drive, get out of a car and how he walked. She testified that she had attended plaintiff's sessions with the physical therapist twice and that the video was an accurate depiction of plaintiff and his therapy session. As with a photograph, Rosanne had personal knowledge of the contents of the video and the trial court properly accepted this as a foundation.

The trial court also found the danger of any prejudice did not outweigh its probative value. The video in this case is unlike those in *Spyrka* and *French*. In *Spyrka*, the video that was found to be prejudicial was a step-by-step animation of what happened to the plaintiff, not a general demonstrative exhibit to understand the medical condition suffered. Furthermore, the testifying doctor stated that he could not say the video accurately represented what happened to the plaintiff. *Spyrka*, 366 Ill. App. 3d at 168-69. Likewise, in *French*, the video in question purported to familiarize the jury with the scene of an accident that occurred at night. The video, however was filmed in the day and in a fashion that mirrored the alleged chain of events in the case. Accordingly, in both cases, the videos were prejudicial because they preconditioned the minds of the jury to accept the plaintiffs' theories in each case. *Spyrka*, 366 Ill. App. 3d at 169;

18

*French*, 65 Ill. 2d at 82.

As in *Georgacoupoulos*, the video in this case was "tastefully" produced. The video was not produced to improperly precondition the jury on plaintiff's theory. Having viewed the video, it does not present a focus on plaintiff's pain and discomfort to the exclusion of anything else. While plaintiff does wince and/or grimace in different spots in the video, he also smiles and talks with the therapist. There is no undue focus on his pain, it simply focuses on a typical therapy session that the evidence at trial indicated would be required for the rest of plaintiff's life.

2. *Defendant's Surveillance Video*

Defendant argues that the trial court's error in admitting plaintiff's day-in-the-life video was compounded by its failure to allow the surveillance video. Defendant highlights that the trial court indicated during the hearing on defendant's motion to bar the day-in-the-life video that if it was going to be liberal about letting in video evidence for plaintiff it would have to be liberal for both sides. Defendant claims that the surveillance video was relevant to rebut plaintiff's video and the trial court erred in barring its surveillance video. Again, under *Velarde*, we review the admission of video evidence for an abuse of discretion. See also *Warrender v. Millsop*, 304 Ill. App. 3d 260, 270 (1999).

Defendant argues that surveillance videos are relevant and admissible substantive evidence concerning the extent of a plaintiff's injuries in a personal injury suit. *Shields v. Burlington Northern & Santa Fe Ry. Co.*, 353 Ill. App. 3d 506, 509 (2004). Defendant contends that the surveillance video tended to disprove plaintiff's claims regarding the nature of his injuries and his inability to maintain a level of employment. Defendant argues that the trial court

did not properly conduct a balancing test because it found that the probative value did not outweigh the danger of prejudice. Defendant contends that the test requires exclusion only if the probative value is substantially outweighed by the danger of prejudice. *Spyrka*, 366 Ill. App. 3d at 167.

Defendant asserts that this court's ruling in *Carney v. Smith*, 240 Ill. App. 3d 650 (1992), is controlling. In *Carney*, the plaintiff was injured in a car accident and presented various witnesses that testified to his persistent pain and disability, including dragging his foot. *Carney*, 240 Ill. App. 3d at 651-54. The defendant introduced two surveillance videos of the plaintiff moving effortlessly, carrying numerous objects and performing various tasks. *Carney*, 240 Ill. App. 3d at 657.

The trial court overruled the plaintiff's objection to these videos. While the plaintiff admitted that many parts of the videos were consistent with his presentation of evidence and theory of the case and the videos did not show the plaintiff engaging in any vigorous activity, the court found that they did rebut the inference that the plaintiff was in constant pain. Accordingly, this court affirmed the admission of the videos because their probative value outweighed any prejudicial effect. *Carney*, 240 Ill. App. 3d at 657-58.

In addition, defendant argues that the late disclosure of the surveillance video did not warrant exclusion as a discovery sanction pursuant to Rule 219. 210 Ill. 2d R. 219(c). Defendant highlights that the purpose of a discovery sanction is not to punish a party, but to ensure fair proceedings. *Smith v. P.A.C.E.*, 323 Ill. App. 3d 1067, 1075 (2001). Defendant argues that plaintiff was not prejudiced by the late disclosure of the video because Kobliska was deposed and

20

available to testify at trial and the original tape was also available to alleviate concerns regarding distortion. However, defendant maintains that it was prejudiced by allowing plaintiff's day-in-the-life video at such a late date, without a chance for it to provide rebuttal.

Plaintiff responds that the trial court properly denied showing defendant's copied versions of the video because the testimony of both Kobliska and Grant identified issues whether these versions accurately portrayed what they purported to show. As for the original version, plaintiff notes that, at trial, defense counsel argued that the surveillance videos were offered as demonstrative evidence in conjunction with Kobliska's testimony, while on appeal, defendant argues that the video is admissible as substantive evidence. Plaintiff argues that defendant has therefore waived this issue for its failure to stand on the theory presented at trial. *Shannon v. Boise Cascade Corp.*, 208 Ill. 2d 517, 527 (2004).

Plaintiff argues that, waiver notwithstanding, the trial court properly determined that the surveillance video was not probative of the issue being contested. Therefore it concluded that its probative value did not outweigh the possible prejudice. Plaintiff concludes that the cases cited by defendant are factually inapposite and actually support his case. Plaintiff argues that in each case, the surveillance video at issue captured the plaintiffs acting inconsistent with their claims at trial. Furthermore, each case resulted in affirmance of the trial court's discretionary decision.

Plaintiff contends that the trial court was correct in concluding that there was no probative value to the video because it only demonstrated activity that plaintiff admitted. Plaintiff admitted that he can drive and works overseeing construction sites when capable. The surveillance video, plaintiff argues, by its very nature is prejudicial because it suggests that he

21

had been caught doing something he claimed he could not. Plaintiff contends that defendant misrepresents the content of the video because views are obscured for moments that defendant argues plaintiff walks without his cane and over uneven ground. Furthermore, the video could improperly give the impression that plaintiff was capable of constant activity and, thus, was correctly determined to be prejudicial. *Carroll v. Preston Trucking Co.*, 349 Ill. App. 3d 562 (2004).

First, if the surveillance video is substantive evidence as defendant argues, it was properly excluded. Neither Kobliska nor the video was disclosed by defendant during discovery. Kobliska testified that he filmed the video in February 2006, informing defendant on February 9, 2006, that he had made a videotape. The fact that defendant did not receive the final copy of the video until March 21, 2006, does not remove the requirement of disclosure or the duty to seasonably supplement disclosure pursuant to Rule 214. 166 Ill. 2d R. 214. However, the video was offered as demonstrative evidence and, despite defendant's arguments, it was not barred by the trial court as a discovery sanction. The trial court simply prefaced its holding by noting defendant's failures to promptly supplement disclosures and disclose Kobliska as a trial witness.

The trial court then weighed the probative value of the video against the possible prejudice pursuant to *Cryns*. We agree that the trial court did not abuse its discretion in barring the video as demonstrative evidence. The video did not counter any claims made by plaintiff. Plaintiff maintained that he worked and drove when he was physically able. The video shows just that. However, the danger of undue prejudice outweighed any probative value.

In *Carroll*, the defendant offered a surveillance video of the plaintiff, who had made a

22

worker's compensation claim, walking without a cane, moving a ladder, operating a chainsaw, and completing other labor-intensive work in his yard. *Carroll*, 349 Ill. App. 3d at 564-65. The *Carroll* court opined that the video was probative to show the extent of the plaintiff's incapacitation and that the defendant could have used the plaintiff as a foundational witness. *Carroll*, 349 Ill. App. 3d at 566. However, it held that the trial court did not abuse its discretion because the unfair prejudice that resulted from the editing showing the plaintiff completing physical tasks. This left the impression that he could maintain such activity for long periods of time when they were completed over a short time period. *Carroll*, 349 Ill. App. 3d at 567.

While, under *Carney* and *Carroll*, it could be said that the trial court erred in saying that the video was "not probative to any issue" because the video was probative to counter plaintiff's claims of constant pain, the harm of prejudice outweighed any probative value. Despite defendant's contention that Kobliska testified that the video was not edited to demonstrate only the period plaintiff was working and that he filmed at every moment that he could, the video leaves the impression that plaintiff was working for extended periods of time. Unlike *Carney*, there is no direct rebuttal of plaintiff's claims to boost its probative value.

The trial court highlighted that the video is obscured frequently and there were other times where the plaintiff is just sitting in a car. The trial court opined that it was impossible to determine if these obscured moments were downtime or active and, as in *Carroll*, determined this could lead to the impression that plaintiff was actively working on the site. Under *Carroll*, this conclusion was not an abuse of discretion.

### 3. *Frye Hearing on the SPECT Scan and Related Testimony*

Defendant argues that the trial court erred in concluding that the SPECT scan was generally accepted scientific evidence under *Frye*. Defendant also contends that even if the trial court's ruling on the SPECT scan was correct, plaintiff's witnesses improperly testified regarding their use of the scan in treating plaintiff. The admissibility of evidence is a matter that typically rests squarely within the discretion of the trial court. *Agnew v. Shaw*, 355 Ill. App. 3d 981, 988 (2005). However, in reviewing a trial court's *Frye* analysis, we conduct *de novo* review and may rely on materials outside the record, including legal and scientific articles and opinions from courts of other jurisdictions. *In re Commitment of Simons*, 213 Ill. 2d 523, 530-32 (2004).

First, defendant argues that this court should adopt the test set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993), because it constitutes a clarification of the standard for admission of scientific evidence. Plaintiff asserts that defendant waived this issue for its failure to raise it until the posttrial motion. However, defendant discussed *Daubert* in both its motion *in limine* seeking to bar the SPECT scan evidence and in its posttrial brief.

While our supreme court has recently noted that Illinois courts have not addressed the issue of whether *Daubert* should supplant *Frye*, it has continued to hint that this issue is ripe for its consideration. See *People v. McKown*, 226 Ill. 2d 245, 247 (2007). However, Illinois case law is replete with references that Illinois law is "unequivocal" in that the exclusive test for the admission of expert testimony is the general acceptance test of *Frye*. *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76 (2002). Although we are bound to precedent until our supreme court adopts a new test, the issue bears quick review. See *Mekertichian v.*

No. 1-06-2418

*Mercedes-Benz U.S.A., L.L.C.*, 347 Ill. App. 3d 828, 836 (2004).

Under the general acceptance test of *Frye*, scientific evidence is admissible if the methodology underlying the opinion is "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. The focus of this test is on the underlying methodology of the opinion and not the ultimate conclusion. *Agnew v. Shaw*, 355 Ill. App. 3d 981, 988 (2005). For federal cases however, *Daubert* held that the *Frye* standard was superseded by the adoption of the Federal Rules of Evidence. *Daubert*, 509 U.S. at 587, 125 L. Ed. 2d at 479, 113 S. Ct. at 2793-94.

Like *Frye*, *Daubert* seeks to determine the soundness of an expert's methodology. Unlike the simple and open general acceptance requirement of *Frye*, *Daubert* provides "general observations" to consider in determining whether a standard of evidentiary reliability has been reached that would assist the trier of fact in understanding the fact at issue. *Daubert*, 509 U.S. at 591-93, 125 L. Ed. 2d at 481-83, 113 S. Ct. at 2795-97. Though "flexible" and not exhaustive, *Daubert* listed the following considerations to be examined: whether the methodology has been tested; whether the theory or technique has been submitted for peer review or publication; if there is a known or knowable rate of error; if the theory or practice has been generally accepted in the proper scientific community; and the existence of standards controlling the technique. *Daubert*, 509 U.S. at 593-95, 125 L. Ed. 2d at 482-84, 113 S. Ct. at 2796-98.

Accordingly, it is plain that *Daubert* provides additional guidance to courts in determining the standard of evidentiary reliability of scientific evidence. As the *Daubert* court noted, debate and scholarship on the merits of the *Frye* test are legion. Over the 85 years of

25

developing law since the decision in *Frye*, many established tests have been supplanted by the courts and legislature. While we are in no position to make such a change, we agree it may be due time for our supreme court's worthy consideration, though the facts of this case are likely insufficient for a proper challenge to the rule.

As noted above, the trial court in this case properly followed *Donaldson* and conducted a *Frye* hearing. The trial court concluded that testimony could be heard on plaintiff's SPECT scan, but limited to the conclusion that it was consistent with a finding of traumatic brain injury and not that it could prove causation. Defendant argues that the trial court erred in this conclusion because it rested on Pavel's testimony alone. In addition, it argues that the trial court erred in allowing other experts to testify in violation of this ruling. For further support, defendant also cites to scientific articles and case law from foreign jurisdictions.

The two 1996 scientific journal articles cited by defendant opined that the few controlled experimental studies in using SPECT scans have left the use of the technology in forensic situations speculative. See Society of Nuclear Medicine Brain Imaging Council, *Ethical Clinical Practice of Functional Brain Imaging*, 37 J. of Nuclear Med. (July 1996); American Academy of Neurology, *Assessment of Brain SPECT*, 46 Neurology 278-285 (1996). Defendant also relies heavily on case law from the court of appeal of California. See *People v. Yum*, 111 Cal. App. 4th 635, 637-39, 3 Cal. Rptr. 3d 855, 855-57 (2003). The *Yum* court found that, based on the testimony of the defendant's expert and the prosecution's expert witness, the defendant had not shown that SPECT scans had achieved general scientific acceptance to diagnose brain trauma and post-traumatic stress disorder. *Yum*, 111 Cal. App. 4th at 639, 3 Cal. Rptr. 3d at 857.

Defendant also argues that Pavel's testimony during the *Frye* hearing was insufficient. Defendant cites to Pavel's admissions that there is no data on the known error rate for false positive scans, that double-blind studies have not been conducted, that it is possible that drug use might skew the results of a scan, and that there is no accepted methodology in using a SPECT scan for diagnostic purposes. Defendant notes that Pavel did not conduct a blind assessment of plaintiff's scan as he was informed of plaintiff's history. In addition, Pavel did not compare plaintiff's scan to a "normal" scan to identify abnormalities.

Finally, defendant argues that the trial court erred in allowing Rodos, Yarkony and Kohn to testify regarding the scan. Yarkony testified that he reviewed the SPECT scan and Pavel's report. Yarkony testified that, as he was not a neuroradiologist, he would have to rely on the report interpreting the scan, but opined that the scan confirmed the diagnosis of traumatic brain injury. Likewise, Rodos testified he was not an expert in SPECT scans, but, as with Yarkony, he was allowed to testify that Pavel's interpretation showed the scan was diagnostic. Rodos further opined that he told plaintiff to halt the medications he was taking before the scan because they could skew the results. Kohn testified that plaintiff's SPECT scan showed damage to both hemispheres of the brain, specifically identifying a *coup contre coup* injury.

Defendant contends that, with respect to Kohn, plaintiff violated Rule 213(f)(2) in failing to disclose that Kohn would testify to the SPECT scan. Official Reports Advance Sheet No. 26 (December 20, 2006), R. 213(f)(2), eff. January 1, 2007. Defendant admits that Kohn was disclosed by plaintiff and defendant did not notice his deposition, even though it had every opportunity to do so. Defendant maintains that the spirit of the amended rule was violated

because plaintiff did not specifically state Kohn would testify to the SPECT scan. See *White v. Garlock Sealing Technologies, LLC*, 373 Ill. App. 3d 309, 323-24 (2007). Defendant concludes that plaintiff's tactical gamesmanship surprised and prejudiced defendant in direct violation of the spirit of open disclosure because Kohn's trial testimony went far beyond what it expected from the disclosure.

We agree with plaintiff's response that, while it is questionable that a *Frye* hearing was necessary in this case because SPECT scans are not novel science, the trial court prudently conducted a hearing. Perhaps 10 years ago there would be no question that a hearing was required and defendant's proffered scientific articles would have been cause to deny the evidence. Certainly, if *Daubert* were the test, this case would have been considerably closer based on a full review of the enunciated "considerations" of that test. However, as it stands, Pavel testified during the *Frye* hearing that, at the date of trial, the SPECT technology had been widely used for over 20 years and that virtually all university hospitals and many larger hospitals conduct SPECT scans.

Pavel testified to his personal experience of almost 15 years with SPECT scans, almost entirely with brain SPECT scans. Pavel has authored scientific articles on its use in this capacity as well. As to the methodology, Pavel indicated SPECT scan analysis is similar to X-ray or other imaging analysis. Students are taught what normal scans look like in medical school, and based on this, continuing literature and gathered experience, Pavel makes determinations regarding the scan result. Pavel admitted that he could not conclude what caused an injury, but reviewing a scan, he could identify abnormalities consistent with certain injuries.

The trial court actively questioned Pavel during the hearing, specifically on his process and the conclusions that he could make. As a result, the trial court ultimately limited his testimony to whether the SPECT scan was consistent with a traumatic brain injury. Pavel's testimony about the extensive use of SPECT scans and detailed explanation about the process of analyzing the scans was sufficient to support the introduction of the evidence. Pavel was not discredited as a witness and supported his testimony to the trial court's satisfaction. It was not an error to find this testimony sufficient and that the 1996 articles defendant relied on at trial, and here on appeal, were dated and did not diminish Pavel's testimony. Furthermore, unlike in *Yum*, where the testimony of two doctors did not support introduction of SPECT scans as a diagnostic tool for brain trauma and traumatic stress disorder, here Pavel's testimony was extensive and sufficient. The trial court's limitation on the testimony against statements that the scans were diagnostic further distinguishes this case from *Yum*.

We also note plaintiff's citation to Illinois courts that have allowed SPECT scan evidence in various cases. See *People v. Urdiales*, 225 Ill. 2d 354 (2007); *Matuszak v. Cerniak*, 346 Ill. App. 3d 766 (2004). In addition, other jurisdictions have accepted this evidence after applying the *Daubert* test. See *Rhilinger v. Jancsics*, 8 Mass. L. Rep. 373 (1998). Similar to this court, the *Rhilinger* court was presented with evidence regarding the use of SPECT brain scans for 15 years and determined that under *Daubert*, their use at trial would aid the trier of fact in determining if abnormalities in brain function existed. We believe that, even if the trial court followed *Daubert*, as defendant contends would have been proper, its motion *in limine* would still have been properly denied. Pavel testified that he has submitted articles for publication,

SPECT scans are in wide use throughout the profession, and baseline images are presented in medical schools teaching this technology. Furthermore, three additional doctors - Yarkony, Rodos and Kohn - testified to their use of SPECT scans in this type of case.

With respect to the testimony of these doctors, plaintiff asserts that these doctors were not subject to the *Frye* hearing. As treating doctors, plaintiff argues, each witness simply presented medical opinion testimony regarding their diagnoses of plaintiff and were outside the reach of *Frye*. *Noakes v. National R.R. Passenger Corp.*, 363 Ill. App. 3d 851, 857-58 (2006). Furthermore, plaintiff argues that each witness was disclosed during discovery and their treating records were also disclosed. In particular, plaintiff points to the medical records of Kohn and Rodos that indicated Kohn reviewed the SPECT scan and opined there was under perfusion in the anterior and posterior areas. Plaintiff concludes that defendant was fully apprised of the fact these doctors were witnesses and the records upon which they would testify and defendant's failure to depose Kohn cannot be cured by arguing disclosure was improper.

We agree that the trial court did not abuse its discretion in allowing the treating doctors to discuss their use of the SPECT scan. As the *Noakes* court stated, where opinion testimony is based on the physician's personal knowledge and practical experience and not "studies and tests," it is not subject to a *Frye* test. *Noakes*, 363 Ill. App. 3d at 857-58. Each doctor's experience and qualifications were presented to the jury and each testified to how the SPECT scan was used in their determination that plaintiff had suffered a traumatic brain injury. The fact that some relied on Pavel's report does not remove the fact that is how each doctor diagnosed and treated plaintiff. *Frye* hearings establish whether the process or methodology is generally

30

acceptable, not an ultimate conclusion or opinion as these doctors provided. Defendant was afforded the opportunity to review the doctors' records in full and was free to fully depose each of these doctors and present countering opinions to persuade the jury of its case.

### B. Jury Instructions

Defendant contends that the trial court committed reversible error by refusing its requested instruction advising the jury that lost wages, profits or income was not at issue in the case. A particular jury instruction is proper if it is sufficiently clear, fairly and correctly states the law, and is supported by some evidence in the record. *Rios v. City of Chicago*, 331 Ill. App. 3d 763, 776 (2002). In determining whether jury instructions were inadequate, we will remand for a new trial only if the trial court clearly abused its discretion. *Villa v. Crown Cork & Seal Co.*, 202 Ill. App. 3d 1082, 1087 (1990).

We find that the trial court did not abuse its discretion in refusing defendant's requested jury instruction. Defendant argues that the trial court granted its motion *in limine* barring the wage loss claim and asserts that this "directed finding" required the limiting instruction. Defendant does not cite to this motion in the record, and this court could not locate the motion. The record indicates the trial court granted this motion without objection or further detail.

Plaintiff correctly notes that at the outset of trial he informed the judge that there was no wage loss claim. Plaintiff reiterated during defendant's motions *in limine* that there was no lost wage claim and added it was withdrawn because with plaintiff's new company, it was too difficult to prove. Defendant then argued during closing that it was curious that plaintiff had not made a lost wage claim. Plaintiff responded during rebuttal that no lost wage claim was filed

because it would be too speculative.

Both parties also argued during closing that the jury was not to consider any income or lost future income during deliberations. The trial court tendered instructions detailing what elements of damage it could consider. The trial court found no reason to confuse the jury with an instruction on an issue not before it  Instead, it stated that defendant could argue the point to the jury.

Defendant's presentation and reliance on *Wille v. Navistar International Transportation Corp.*, 222 Ill. App. 3d 833 (1991), are misguided. In *Wille*, the trial court denied the plaintiff's motion *in limine* to bar evidence or argument that he assumed the risk of injury. At the close of evidence, the trial court entered a directed verdict on that issue, but refused to instruct the jury on the directed verdict, noting that plaintiff's counsel could cover that issue in closing. Defense counsel proceeded to extensively argue in closing, over objection, that plaintiff's actions were the proximate cause of the injury. *Wille*, 222 Ill. App. 3d at 837. This court reversed for the trial court's failure to fully instruct the jury as to the applicable law because it did not instruct the jury of the directed finding. This error was especially prejudicial because the defendant's closing argument on this issue covered 11 pages of trial transcripts. *Wille*, 222 Ill. App. 3d at 839-40.

In this case, there was no need for a directed verdict or directed finding as plaintiff withdrew any lost wage claim. Although the motion is not of record, defendant apparently moved to bar any discussion or evidence of lost earnings, past or future. No evidence on lost wages was presented because plaintiff had withdrawn the claim. *Wille* is also distinguishable because, here, defendant raised the issue in closing and plaintiff limited his rebuttal comments to

a brief paragraph responding that he did not advance a lost wage claim as it would be speculative and overreaching. This in no way is comparable to an extensive argument on causation. The jury was informed by both parties there was no lost wage claim and the jury instructions clearly provided the elements of damage the jury could consider.

## C. Improper Damages Award

Finally, defendant contends that the jury award of $6 million was excessive and should be reversed with remand for further proceedings on that issue or a substantial remittitur must be entered. The question of damages is specifically reserved for the trier of fact, and we will not substitute our judgment lightly. We may reverse or modify a damages award as excessive only if it is unfair and unreasonable, if it results from passion or prejudice, or it is so excessively large that it shocks the conscience. *Mikolajczyk v. Ford Motor Co.*, 374 Ill. App. 3d 646, 671 (2007), appeal allowed 225 Ill. 2d 637 (2007).

Defendant argues that the jury's award is radically disproportionate to the economic loss such that the award bears no relationship to plaintiff's losses. Defendant notes that the noneconomic loss determined by the jury was over 70 times greater than the economic loss of the stipulated medical bills. Defendant argues that this fact alone makes the verdict shocking and excessive as a matter of law. In support of remittitur, defendant cites a case from the Mississippi Supreme Court where a substantial remittitur was affirmed due to hugely disproportionate noneconomic damages. Defendant also argues that this court should reverse where the award bears no relationship to the loss suffered. *Gill v. Foster*, 157 Ill. 2d 304, 315 (1993).

Defendant notes that damages must be proved to be recovered. *Chrysler v. Darnall*, 238

Ill. App. 3d 673, 680 (1992). Furthermore, defendant argues that the jury may make a just estimate of damages and it may not base its award purely on guesswork. *Levin v. Welsh Brothers Motor Service, Inc.*, 164 Ill. App. 3d 640, 655 (1987). Defendant argues that plaintiff's counsel "pulled figures from the air" for the verdict request to the jury of $8 million for disability, $500,000 for disfigurement, $5 million for future pain and suffering, and $82,500 for medical costs.

Defendant argues that plaintiff merely suffered a mild traumatic brain injury resulting in a cranial nerve injury, headaches, back and shoulder pain, a movement disorder, and depression. Defendant points out that plaintiff still works as a construction supervisor, still walks, talks, eats, sees, hears, tastes, smells, carries trays of coffee, drives, shops, pumps gas, operates a cell phone, and attends rehabilitation. Defendant further notes that plaintiff was not rendered a paraplegic or quadriplegic, incontinent or bed-ridden. Accordingly, defendant concludes that the noneconomic damages award lacks support in the record.

Plaintiff responds by highlighting the great discretion granted to the jury in setting the amount of a verdict. *Velarde*, 354 Ill. App. 3d at 539-40. Plaintiff notes that *Velarde* also cites several factors that may be used in reviewing compensatory damages, including the permanency of the condition, the possibility of future deterioration, the extent of medical expenses, and the restrictions imposed due to the injuries suffered. *Velarde*, 354 Ill. App. 3d at 540. Plaintiff also argues that Illinois does not require any particular ratio of economic loss to non-economic loss and that the evidence presented at trial supported the jury's award.

First, as we affirmed the trial court's evidentiary findings above, we need not consider

defendant's argument that the alleged errors also demonstrate the damages award resulted from passion, prejudice and improper considerations. In addition, we need not consider the foreign jurisdiction case cited by plaintiff when Illinois case law sufficiently covers this subject. Next, we agree with plaintiff that *Gill* supports plaintiff's argument. *Gill* reiterates the principle that the jury is vested with great discretion in fashioning an award in rejecting a claim damages were disproportionate to the loss suffered. In addition, we note that defendant has argued that more than mere guesswork is required to fix damages based on *Levin*; however, that case specifically discusses the computation of lost earning capacity. *Levin*, 164 Ill. App. 3d at 655.

While a damage award for noneconomic damages such as those suffered by plaintiff is subject to even less precision than economic damages or lost wages, it still must be a product of the evidence and not passion such that it is shockingly excessive. As defendant indicated, a "plethora of medical evidence," was presented at trial. That evidence indicated plaintiff's life will be negatively affected for the remainder of his life, with a life expectancy of more than 40 years.

While it is true that plaintiff has retained a certain amount of ability to function since the accident as defendant enumerates, the evidence also showed that each of those activities listed by defendant is limited by plaintiff's lost mobility, increased pain, and depression. Furthermore, testimony was given indicating that, as plaintiff aged and his body deteriorated, his symptoms would likely worsen. While $6 million is a large sum, it is by no means so large as to shock the conscience as compensation for the lifetime of consequences that plaintiff and his family face due to the physical and mental limitations posed by his injuries.

## III. CONCLUSION

Accordingly, for the aforementioned reasons, the decision of the trial court is affirmed.

Affirmed.

NEVILLE, P.J., and CAMPBELL, J., concur.

No. 1-06-2418

| | |
|---|---|
| Please Use Following Form:<br><br>Complete TITLE of Case | VINCENT DONNELLAN,<br><br>         Plaintiff-Appellee,<br><br>v.<br><br>FIRST STUDENT, INC.,<br><br>         Defendant-Appellant<br><br>(Earl F. McClendon,     Defendant.) |
| Docket No. | |

COURT

Opinion Filed

Nos. 1-06-2418
Appellate Court of Illinois
First District, FOURTH Division

JUSTICES

June 19, 2008
(Give month, day and year)

JUSTICE MURPHY delivered the opinion of the court:

APPEAL from the Circuit Ct. of Cook County, Chancery Div.

Neville, P.J. and Campbell, J.,         concur [s]

dissent[s]

Lower Court and Trial Judge(s) in form indicated in the margin:

For APPELLANTS, John Doe, of Chicago.

The Honorable   Arthur J. Janura        , Judge Presiding.

For APPELLEES, Smith and Smith of Chicago, Joseph Brown, (of Counsel)

Also add attorneys for third-party appellants or appellees.

Indicate if attorney represents APPELLANTS or APPELLEES and include attorneys of counsel. Indicate the word NONE if not represented.

Attorney for Plaintiff-Appellant First Student, Inc.:   Edward M. Kay, Paula M. Catstensen
Clausen, Miller P.C.
10 S. La Salle Street, Chicago, IL 60603
312.855.1010

Attorneys for Plaintiff-Appellee Vincent Donnellan:   William J. Harte, Ltd.
111 W. Washington Street, Suite 1100
Chicago, IL 60602
312.726.5015
     -and-
The Healy Law Firm
111 W. Washington Street, Suite 1425

Chicago, IL  60602

Of counsel:     Martin J. Healy, Jr., Kevin T. Vuegeler, William J. Harte, Joan M. Mannix,